KREEDA BIMBERG v. NORTHERN PACIFIC RAILWAY COMPANY.[1,2]

Nos. 33,568, 33,892.

April 14, 1944.

[1]Reported in 14 N. W. (2d) 410.
[2]Certiorari denied by U. S. Supreme Court October 16, 1944.

*Gillette, Nye, Harries & Montague,* W. O. Bissonett, L. B. da Ponte, and *Frederic D. McCarthy,* for appellant.

*Henry Paull,* for respondent.

STREISSGUTH, JUSTICE.

Clifford Bimberg, employed by defendant as a bridge carpenter, incurred fatal injuries in falling off a wooden trestle or bridge on a branch line of defendant running from Duluth, Minnesota, to Ashland, Wisconsin. This action, brought by the administratrix of his estate under the federal employers liability act, in current fashion referred to as F. E. L. A. (35 Stat. 65, c. 149, as amended, 36 Stat. 291, c. 143, 53 Stat. 1404, c. 685; 45 USCA, § 51, *et seq.*), resulted in a verdict for plaintiff in the sum of $3,240 for pecuniary loss to his sole beneficiary and $2,060 for decedent's conscious pain and suffering.

On October 1, 1941, the day of the accident, one of defendant's bridge and building crews—consisting of a straw boss and four carpenters, including Bimberg—was assigned to the job of lining or straightening a track, running east and west, on a wooden bridge or trestle which crossed a deep ravine near Iron River, Wisconsin. The bridge was about 300 feet long and, at the point from which Bimberg fell, about 40 feet above the level of the ground. Except for a single steel girder constituting the middle span, the bridge was constructed of timber. Wooden stringers, paralleling the steel girder and covered with sheet iron, furnished the immediate support or base for the ties upon which the rails were spiked. Every fourth tie was bolted to the stringers upon which it rested. By removing the spikes holding the rails to the ties so bolted, the deck, consisting of rails and ties, could be moved a fraction of an inch at a time by use of iron lining bars. These bars were about 4½ feet long, weighed 28 pounds, and were shaped like a chisel at one end, with a flat sharp edge about 1½ inches

wide. In the work of lining the tracks, the bars were placed under the rails, then anchored upon the metal covering the stringers, and finally heaved in unison by four men, two at each rail, upon signal from one of them.

The bridge carried a single continuous or "running" track. Inside this track were placed two additional steel guardrails designed to prevent trains from leaving the bridge in case of derailment. Near the outer edge on each side of the bridge and running lengthwise of the bridge was a 6 x 8 wooden stringer, called a guardrail or guard timber, laid "flatwise," but so notched as to fit between the ties and prevent their bunching or spreading. Other than these stringers—which at best extended only 5½ to 6 inches above the tops of the ties—there was no guardrail, cable, fence, or structure of any type to prevent workmen and others from falling off the bridge. Nor were the members of the crew equipped with safety belts or other devices to prevent such a contingency.

The ties used on the east end of the bridge were 12 feet long, but on the section of the bridge on which the crew was working at the time of the accident they were only 10 feet long. The ties were nominally 8-inch ties, but actually they were about 7½ inches wide; their centers were spaced 14 to 15 inches apart, leaving an open space of from 6 to 8 inches between them.

The track across the bridge having been reported to be about ½ inch out of line, the crew of which Bimberg was a member was dispatched to Iron River on the morning in question to line it up. It was estimated to be about a 3½-hour job. First in order of work was the removal of the spikes from each of the anchored ties for a distance of 80 to 90 feet, or about three rail lengths from the east end of the bridge. The removal of these spikes permitted the deck of the bridge to be wedged either to the north or south as required. Seeford Swanson, in charge at the time, stood at the east end sighting the rails, while the other four men, each equipped with an iron lining bar, took positions in the form of a square east of the center of the bridge, two men at each rail. Bimberg and John Anderson stood between the rails and worked on the south

rail, while Floyd Kuru, a comparatively inexperienced bridge worker, and Myron Johnson stood between the north rail and the north edge of the bridge and worked on the north rail. Having inserted their lining bars under the rails, the four men, at an appropriate "Yo-ho" signal given by Anderson, simultaneously heaved on their bars, three or four such operations resulting in moving the deck about ¼ of an inch toward the south. On the next operation, Bimberg's bar slipped, he lost his footing, and pitched over the south edge of the bridge into the ravine below, thereby sustaining fatal injuries.

The day was clear and the top deck of the bridge dry. There was nothing broken or in disrepair on the bridge other than the misalignment of the track, and no claim is made that the lining bars used were unfit for the purposes intended.

Liability of defendant is sought to be predicated upon (1) its alleged failure to furnish decedent with a safe place to work; (2) its alleged failure to provide safeguards against the danger of workmen falling off the bridge; (3) its alleged failure to instruct fellow employes as to the proper manner of doing their work; and (4) the alleged negligence of such fellow servants. Only the first two charges of negligence need be considered.

Defendant rested its case in the court below and rests it here principally on the broad proposition that, because the proper construction of this trestle bridge is an engineering problem for solution by the railroad and not by the courts, its construction according to an approved plan in general use in rural districts is conclusive in its favor on the issue of negligence. It argues that to compel a railroad to erect guardrails or other safeguards at the edge of bridges or trestles upon branch lines in rural districts, or to build solid floors on such bridges, or to use longer ties than the customary 10- or 12-foot ties, or to provide bridge crews with safety belts is to exact more than the required degree of care; and that, as a matter of law, it has fulfilled all the requirements of due care in building and maintaining its rural bridges according to general practice and custom. It further asserts that "these wooden trestle

bridges are designed principally for the operation of trains thereon, and costs of construction must be commensurate with the type and amount of traffic passing over that particular line of railroad."

Anticipating such defense, the plaintiff, in addition to detailed explanation by oral and photographic testimony as to the construction of the bridge here involved, offered expert testimony that according to good engineering practice the open space between ties on bridges should not exceed 4 inches, so as to provide a better floor; that 12-foot ties are safer and more standard than 10-foot ties; and that either a temporary or permanent railing should be provided to protect workmen from falling off a bridge of this character. Plaintiff's experts were of the opinion that accidents of the type here involved could largely, if not wholly, be avoided by erecting guardrails, by spacing the ties closer, and by providing the bridge crews with safety belts.

Notwithstanding persuasive evidence that the bridge here involved was built in conformity with the general usage and custom among railroads, the trial court denied defendant's motion for a directed verdict, and, after a verdict for plaintiff, its motion for judgment notwithstanding the verdict.

This being an action under the F. E. L. A., the correctness of these rulings is a federal question, notwithstanding the sufficiency of the evidence to establish negligence is involved. 2 Roberts, Federal Liabilities of Carriers (2 ed.) § 821. "Only by a uniform federal rule as to the necessary amount of evidence may litigants under the federal act receive similar treatment in all states." Brady v. Southern Ry. Co. 320 U. S. 476, 479, 64 S. Ct. 232, 234, 88 L. ed. —. But, as the authorities we shall cite establish, there is, in fact, no distinction in the tests applied by the federal courts and those uniformly applied by this court in cases arising under our own laws.

Local usage and general custom, either singly or in combination, will not justify or excuse negligence. They are merely foxholes in one of the battlefields of law, providing shelter but not complete protection against charges of negligence. The generality of its plan of construction for trestles or bridges cannot excuse a rail-

road company from responsibility for negligence in its construction. Such plan of construction, commonly followed and "fortified," as defendant insists, "by many years of successful railroad operation," may be evidence of due care, but it cannot avail to establish as safe in law that which is dangerous in fact. 38 Am. Jur., Negligence, § 33; Minneapolis S. & D. Co. v. Metropolitan Bank, 76 Minn. 136, 78 N. W. 980, 44 L. R. A. 504, 77 A. S. R. 609; Anderson v. Fielding, 92 Minn. 42, 99 N. W. 357, 104 A. S. R. 665; Wiita v. Interstate Iron Co. 103 Minn. 303, 115 N. W. 169, 16 L.R.A.(N.S.) 128; Rickerd v. C. St. P. M. & O. Ry. Co. (8 Cir.) 141 F. 905, 73 C. C. A. 139; Texas & P. Ry. Co. v. Behymer, 189 U. S. 468, 23 S. Ct. 622, 47 L. ed. 905; Wabash Ry. Co. v. McDaniels, 107 U. S. 454, 2 S. Ct. 932, 27 L. ed. 605; C. M. & St. P. Ry. Co. v. Moore (8 Cir.) 166 F. 663, 92 C. C. A. 357, 23 L.R.A.(N.S.) 962; Midland Valley R. Co. v. Bell (8 Cir.) 242 F. 803, 155 C. C. A. 391; C. G. W. Ry. Co. v. McDonough (8 Cir.) 161 F. 657, 88 C. C. A. 517; 2 Roberts, Federal Liabilities of Carriers (2 ed.) § 809.

The contrary doctrine is traceable in many decisions to the common-law rule that the servant assumes the ordinary risks of his work or those usual to his employment. 35 Am. Jur., Master and Servant, § 124; Note, 68 A. L. R. 1416. Such decisions may now be entirely disregarded, for "every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment" to F. E. L. A. Tiller v. Atlantic Coast Line R. Co. 318 U. S. 54, 58, 63 S. Ct. 444, 446, 87 L. ed. 610, 612, 143 A. L. R. 967. Even before the amendment, the United States Supreme Court, in a case to which the present appellant was a party, had declared that "Ordinary care * * * is not merely such care as other railroad companies exercise under like circumstances, for other railroad companies may be careless." Northern Pacific R. Co. v. Mares, 123 U. S. 710, 719, 8 S. Ct. 321, 326, 31 L. ed. 296, 301.

We do not say that the duty to erect guardrails, to provide continuous footing, to equip bridge crews with safety belts, or to take safety measures other than those defendant had adopted appears from the record here as a matter of law. The issue of negligence

was one of fact, and this, though there may have been no dispute as to general custom and practice, nor as to any of the facts and circumstances surrounding the accident.

The right of a party to a negligence action to have the jury pass upon the question of liability is not limited to cases where facts are in dispute and the evidence conflicting. When the proof discloses such a state of facts, whether controverted or not, that in essaying to fix responsibility for the injury different minds may reasonably arrive at different conclusions or may reasonably disagree as to the inferences to be drawn from the facts, the issue of negligence *vel non* is for the jury. 38 Am. Jur., Negligence, § 345; Christianson v. N. W. Compo-Board Co. 83 Minn. 25, 85 N. W. 826, 85 A. S. R. 440; Tennant v. Peoria & Pekin Union Ry. Co. 321 U. S. 29, 64 S. Ct. 409, 88 L. ed. ——; Tiller v. Atlantic Coast Line R. Co. 318 U. S. 54, 63 S. Ct. 444, 87 L. ed. 610, 143 A. L. R. 967, *supra;* Bailey v. Central Vermont Ry. Inc. 319 U. S. 350, 63 S. Ct. 1062, 87 L. ed. 1444, *infra*.

The legal duty or standard of conduct to be applied to either admitted or disputed facts must be declared by the trial court as a yardstick to be used by the jury in determining whether negligence has been established. Equipped with such yardstick, the role of the jury is to apply it to the conduct in question and determine whether it measures up to standard. Whether the standard of care which should have been exercised was actually exercised is a question of fact to be determined by the jury from their knowledge and experience, except in those rare cases where not only the facts but the permissible inferences therefrom are so certain that reasonable men, in the exercise of a fair and impartial judgment, must agree upon and draw the same conclusion. Ryder v. Kinsey, 62 Minn. 85, 64 N. W. 94, 34 L. R. A. 557, 54 A. S. R. 623; Brady v. Southern Ry. Co. 320 U. S. 476, 64 S. Ct. 232, 88 L. ed. ——, *supra*.

Reasonable men might well differ as to whether or not the bridge from which Clifford Bimberg fell was a safe place to work, notwithstanding its conformity with the usual standards of railway construction. More regard for the safety of its employes and less

for the item of incidental expense might have suggested to the railroad company either temporary or permanent guardrails, longer ties with closer spacing, or safety belts to prevent just such accidents as here described.

Under the F. E. L. A., as at common law, a railroad company owes its employes the duty to use reasonable care in furnishing them a safe place to work. Bailey v. Central Vermont Ry. Inc. 319 U. S. 350, 63 S. Ct. 1062, 87 L. ed. 1444. This duty becomes more imperative as the risk increases. "Reasonable care becomes then a demand of higher supremacy." Patton v. Texas & P. Ry. Co. 179 U. S. 658, 664, 21 S. Ct. 275, 278, 45 L. ed. 361, 365. The duty is a continuing one, "from which the carrier is not relieved by the fact that the employee's work at the place in question is fleeting or infrequent." Bailey v. Central Vermont Ry. Inc. *supra.*

The Bailey case is strikingly similar in its facts to the instant case. There a section man was unloading cinders from a hopper car by dumping them through the ties in a bridge floor onto a roadway beneath the bridge. In preparing to open the hopper, he walked out on the stringer of the bridge and applied a wrench to a nut at the end of a shaft running crossways of the car. The hopper opened, the nut spun, and Bailey was thrown by the wrench into the roadway 18 feet below. Disposing of the question whether there was sufficient evidence to go to the jury on the question of negligence in failing to furnish Bailey a safe place to do the work, the court said (319 U. S. 353, 63 S. Ct. 1064, 87 L. ed. 1447):

"The nature of the task which Bailey undertook, the hazards which it entailed, the effort which it required, the kind of footing he had, the space in which he could stand, the absence of a guard rail, the height of the bridge above the ground, the fact that the car could have been opened or unloaded near the bridge on level ground—all these were facts and circumstances for the jury to weigh and appraise in determining whether respondent in furnishing Bailey with that particular place in which to perform the task was negligent. The debatable quality of that issue, the fact that fair-minded men might reach different conclusions, emphasize the

appropriateness of leaving the question to the jury. The jury is the tribunal under our legal system to decide that type of issue (Tiller v. Atlantic Coast Line R. Co., *supra* [318 U. S. 54, 68, 63 S. Ct. 444, 87 L. ed. 610, 143 A. L. R. 967]), as well as issues involving controverted evidence. Jones v. East Tennessee, V. & G. R. Co., 128 U. S. 443, 445, 9 S. Ct. 118, 32 L. ed. 478; Washington & Georgetown R. Co. v. McDade, 135 U. S. 554, 572, 10 S. Ct. 1044, 1049, 34 L. ed. 235. To withdraw such a question from the jury is to usurp its functions.

"The right to trial by jury is 'a basic and fundamental feature of our system of federal jurisprudence.' Jacob v. New York City, 315 U. S. 752, 62 S. Ct. 854, 86 L. ed. 1166. It is part and parcel of the remedy afforded railroad workers under the Employers Liability Act. Reasonable care and cause and effect are as elusive here as in other fields. But the jury has been chosen as the appropriate tribunal to apply those standards to the facts of these personal injuries. That method of determining the liability of the carriers and of placing on them the cost of these industrial accidents may be crude, archaic, and expensive as compared with the more modern systems of workmen's compensation. But however inefficient and backward it may be, it is the system which Congress has provided. To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them."

The Bailey case is decisive here so far as the propriety of submitting the issue of negligence is concerned.

During the trial plaintiff had numerous photographs taken of the *locus in quo,* some of which purported to show a lining bar in position ready for the operation of moving track. The photographs showed snow on the bridge, which admittedly was not present at the time of the accident. The court admitted the exhibits in evidence for the limited purpose of illustration, and permitted an expert witness to use them in his demonstrations as to the position of the lining bars while in use. We find no reversible error, the court having properly advised the jury that the photographs were

admitted for the purposes of illustration and demonstration only. The admission in evidence of the photographs and their use by the witness for such purposes was within the discretion of the trial court. Lentz v. M. & St. P. S. R. Co. 135 Minn. 310, 160 N. W. 794.

Defendant also complains of an instruction with regard to the presumption of due care on the part of the decedent given in the following language:

"* * * There is *a presumption of law,* however, that the decedent, that is, Clifford Bimberg, was in the exercise of due care at the time of the accident. And that presumption of law exists because the man is dead and cannot appear in court to testify what happened at the time of the accident as far as his story is concerned." (Italics supplied.)

In Ryan v. Metropolitan L. Ins. Co. 206 Minn. 562, 571, 289 N. W. 557, 561, this court, confessedly running "counter to much that has been said in earlier decisions," adopted the rule that a presumption is not evidence and that plaintiff in an action on a life insurance policy is not entitled to an instruction that "there is in law a presumption against suicide." We there approved a trial court's refusal to instruct on the presumption. In Lang v. C. & N. W. Ry. Co. 208 Minn. 487, 295 N. W. 57, we held that the giving of an instruction on the presumption of due care on the part of the decedent, though technically incorrect, did not warrant the granting of a new trial where there was no evidence upon which the jury could base a finding of contributory negligence.

Conceding that in the instant case there may have been some evidence to justify the submission of the issue 'of contributory negligence, yet the giving of the instruction, which was a correct statement of the law as announced in the Ryan case, was not reversible error. It is common practice for trial courts to state propositions of law to a jury, and not uncommon for them to refer to the presumption of due care on the part of a party charged with negligence. Granted that under the rule of the Ryan case a trial court, in its discretion, may decline to refer to the presumption of due care on the part of a decedent because it is a presumption of

law rather than one of fact, the giving of such instruction without objection on the part of either party cannot taint the jury's verdict with error.

There remains to be considered only the question of excessiveness of the verdict.

The jury allowed $3,240 for pecuniary loss to the sole beneficiary, Kreeda Bimberg, the decedent's maternal grandmother, who was 69 years of age at the time of her grandson's death and had an expectancy of 9 years. Clifford had been brought up in her home as one of her family, and, though only 23 years of age at the time he died, he had contributed from $25 to $30 per month to his grandmother during such brief periods as he was employed. It would appear that the jury arrived at the amount of their verdict by multiplying the number of months of Mrs. Bimberg's life expectancy (108) by the maximum monthly contribution of $30 made by the deceased. While the result is a liberal award and probably represents the maximum which could have been allowed under the evidence, we do not feel justified or inclined to interfere with the jury's computation.

The award of $2,060 for conscious pain and suffering of the deceased is likewise liberal; yet it is not so excessive as to indicate passion or prejudice on the part of the jury.

Bimberg lived about 41 hours after falling from the bridge. His injuries involved the greater portion of the left side of his brain, extending down to the base. His attending physician testified that he was unconscious from the time he entered the hospital at noon on October 1, 1941, until he died early in the morning of October 3. There was, however, testimony on the part of an attending nurse that he was conscious at intervals while at the hospital, that he talked some and moaned considerably, being in extreme pain. Other lay witnesses testified to such statements by him as, "Get away, leave me alone," and, "That is all right"; also of moaning and "hollering" and other manifestations of extreme suffering. Plaintiff's expert physician testified hypothetically that "the testimony of the nurse and certain relatives to remarks made, movement of

his hands and so forth, would indicate that this man responded in a conscious manner to a painful stimulus." The jury was justified in concluding that during a substantial part of the 41 hours involved Bimberg endured conscious pain and suffering.

Consciousness and attendant pain and suffering for an appreciable length of time having been established, it was the function of the jury to determine what the award of damages should be. Such pain and suffering admits of no definite calculation in dollars, nor has congress attempted to furnish a standard by which it may be measured. The F. E. L. A. places no ceiling on recoveries under the act, nor does it fix an hourly or per diem rate for conscious pain and suffering, which would have been a distinct legislative innovation. All that is required to justify a recovery under § 9 of the act is that an appreciable length of time shall have elapsed between the injury and death and that the decedent shall have suffered conscious pain. 45 USCA, § 59, notes 11 and 12; 2 Roberts, Federal Liabilities of Carriers (2 ed.) § 895; Fries v. C. R. I. & P. Ry. Co. 159 Minn. 328, 198 N. W. 998. And the only limitation upon the size of the award is that it must be within reason. 5 Sutherland, Damages (4 ed.) § 1334.

There are many precedents upholding much larger verdicts than $2,060 for conscious pain and suffering of less than two days' duration. Verdicts of $5,000 or more are not uncommon. See Decennial Dig., Death, No. 99(2); St. Louis I. M. & S. Ry. Co. v. Craft, 115 Ark. 483, 171 S. W. 1185, L. R. A. 1916C, 817, affirmed, 237 U. S. 648, 35 S. Ct. 704, 59 L. ed. 1160; and Fries v. C. R. I. & P. Ry. Co. *supra,* where this court conditionally reduced a verdict of $7,500 to $1,500 upon a record which showed that decedent lived less than 5 hours after his fatal accident and was under opiates during most of that period.

The award of $2,060 in the instant case is not so large as to establish abuse or passionate exercise by the jury of its functions. Gauged by the awards made by other juries in similar cases, the award here cannot be said to be fanciful or beyond reason.

Affirmed.

LORING, CHIEF JUSTICE (dissenting).

I cannot see that the defendant should have anticipated injury to anyone from failing to furnish guardrails or safety belts. The only claim here is that there should have been either a railing or that the men should have been furnished with some sort of safety belt, neither of which devices is shown to be in use upon similar bridges. The failure to lay the ties slightly closer together seems too far afield to require discussion. At any rate, there is no evidence that such failure was connected as cause with the accident.

In the performance of the operation of lining up the rails, the men worked in two pairs with a fifth man sighting the rails. Each man of the two pairs was equipped with a special tool called a lining bar. The track on the bridge extended east and west. The pair of men of which Bimberg was a member stood between the rails, usually but not always facing each other. They were moving the rails toward the south and braced themselves on the ties with their feet about two feet apart. The other pair stood outside the track, between the north rail and the guard timber, each with one foot against the guard timber and the other on a tie. They also usually faced each other. All four of them faced their bars and, at a signal, lifted the bars so as to pry the rails toward the south and away from the pair standing outside the track.

Bimberg's position placed him approximately in the middle of the track and five feet from either edge of the bridge. Should anyone of ordinary prudence anticipate that the absence of railings or belts would bring harm of any kind to anyone in that position? Even if the bar slipped, it strikes me that it would appear to a person of ordinary prudence that there was ample space in which to recover lost balance. To require railings or belts to guard against such a remote possibility as that which occurred here would appear to require a higher degree of care than that required of an ordinary prudent man.

Bailey v. Central Vermont Ry. Inc. 319 U. S. 350, 63 S. Ct. 1062, 1063, 87 L. ed. 1444, is clearly distinguishable. There the employe, strange to a new job, was required to do a task always extrahazard-

ous on account of the danger of the kicking wrench. His available footing on the ends of the ties was less than 12 inches, of which 8 or 9 inches were taken up by a stringer set three or four inches in from the outer ends of the crossties. This task, which was performed in the operation of unloading a car as distinguished from repair work, might have been performed in a safer place. True enough, at this particular bridge it was performed but once a year, but at other bridges or places the unloading of the car was necessarily performed by the same means which, on account of the action of the wrench, were so hazardous as to impel the foreman on this occasion to caution Bailey to "be careful the wrench doesn't catch you." There are so many elements present in the Bailey case which are absent here that about the only similarity is that both injuries occurred at a bridge. In the case at bar the only place where the work could be performed was at the bridge. In the Bailey case the court conceived that it might have been practicable to do it elsewhere.

While assumption of risk has been eliminated as a defense, it seems proper for us, in determining whether conduct conforms to the requirements of ordinary care, to grant the right to the alleged tortfeasor to assume that other human beings will act with the care commensurate with the surrounding circumstances. My point is that defendant had a right to assume that the workers would behave as ordinary prudent men would in that environment, and that its conduct should be measured accordingly. Not only that, but even if in the performance of the work a lining bar should slip (which was about the only accident that could happen), it seems to me that reasonable men could not anticipate that in consequence injury would result.

I am in accord with the views of Mr. Justice Roberts expressed in the Bailey case as to the desirability of a workmen's compensation law for railroad workers; but, since congress in its wisdom has chosen to retain common-law negligence as the measure of defendant's duty, we must apply the rules of negligence and not attempt to stretch them into a compensation act or to hold that in

effect the jury shall be judges of the law as well as of the facts. In such cases it is as much our duty to determine whether there is a question of fact as it is theirs to decide upon conflicting facts or inferences. The record impresses me with the view that there should be a reversal.

JULIUS J. OLSON, JUSTICE (dissenting).

To prevail in her action, plaintiff was necessarily required to plead and prove negligence on defendant's part as a proximate cause of decedent's unfortunate accident. Recognizing this requirement, she claims that decedent, at the time and place of his injury, was not furnished a safe place to work; and that, as pointed out in the majority opinion, has for its bases three elements, *viz.*, lack of guardrails, the necessity for closer spacing of the ties, *i. e.*, 4 inches instead of 6 to 8 inches, and, lastly, the failure of defendant to provide the bridge crews with safety belts.

The record discloses, and the majority opinion admits, that defendant's evidence is "persuasive" that the bridge was built and maintained in conformity with the general standards of usage and custom among railroads operating in this territory. Among these are the Great Northern, the Soo Line, the Duluth, Winnipeg & Pacific, the Omaha, and the Duluth, Missabe & Iron Range. The evidence on this phase is not only "persuasive"; it is quite conclusive.

Under the provisions of the federal employers liability act, unless defendant was guilty of actionable negligence, liability cannot be fastened upon it. That has been decided in many cases, the latest coming to our attention being Tennant v. Peoria & Pekin Union Ry. Co. 321 U. S. 29, 32, 64 S. Ct. 409, 411, 88 L. ed. ——, wherein the court held that upon plaintiff rested the duty of proving that defendant "was negligent and that such negligence was the proximate cause in whole or in part of the fatal accident." And, in addition, she "was required to present probative facts from which the negligence and the causal relation could reasonably be inferred."

The majority seems to derive much aid and comfort from what was said in Bailey v. Central Vermont Ry. Inc. 319 U. S. 350, 351, 352, 63 S. Ct. 1062, 1063, 87 L. ed. 1444, 1446, asserting that the facts there shown are "strikingly similar" to those in the case at bar. A more complete recital of the facts in that case is deemed necessary. Bailey was and for some five years had been working for defendant as a section man. As such, the very nature of his work was "strikingly" *dissimilar* to that of a bridge carpenter or repairman, since the work of a section man is on the ground, while that of a bridge carpenter is, as his designation implies, above-ground. Bailey and other members of his crew were required to unload a car filled with cinders. This was pulled onto a bridge over a cattle pass so that the cinders could be dumped through the ties in the bridge floor, which was 18 feet above the ground. The available footing on the side of the car was only 12 inches in width, out of which space 8 or 9 inches were taken by a raised stringer. There was no guardrail. The cinders to be unloaded were in a hopper car. To unload, it was necessary to have one man go onto the bridge on the side of the car and there, while so standing in an obviously narrow and unsafe place, turn a nut, which set in motion a fast-revolving shaft. A heavy wrench some three feet in length was used to turn the nut and thereby "open the hopper" so that the contents would start to flow. This done, the "shaft spins," and the one handling the wrench must immediately "disengage the wrench or let go of it, lest he be thrown off balance or knocked down." Bailey was selected to do this job. He "certainly was unskilled and perhaps unfamiliar in the opening of hopper cars. No one had ever seen him open one." Usually this work was "performed by men older in point of service." It was while he was using this heavy wrench and while in the precariously narrow space on the bridge that the shaft began to "spin." Bailey's hurt caused his fall and the injuries from which he later died.

The facts and circumstances related clearly distinguish that case from this one. The place to which Bailey was assigned was new and strange to him, and so were the implements given him with

which to do the designated job. Obviously, the question of defendant's duty there to an uninstructed man of Bailey's type and training, in the circumstances shown, made its liability a jury issue.

More in point in its facts than the Bailey case is Hanson v. G. N. Ry. Co. 128 Minn. 122, 150 N. W. 380, affirmed, 242 U. S. 615, 37 S. Ct. 211, 61 L. ed. 529. That case, too, involved a railroad's liability under the federal employers liability act to one of its employes, who had fallen from one of its bridges while doing certain repair work on it (128 Minn. 124, 125, 150 N. W. 381):

"* * * The place was dangerous in no different way than is any place so high above solid earth that a false step or loss of balance may mean death or serious injury. It was plainly much less dangerous than many places where men are working every day. The master's duty as to furnishing a safe place is only to use reasonable care, and what is reasonable care depends much upon the particular circumstances. To hold that defendant was guilty of a breach of duty to its servants, because it did not floor over this triangular place in which men were occasionally required to stand while working, would be carrying the safe-place doctrine too far. We would next be asked to say that a contractor for the construction of a modern skyscraper must build platforms for the men who are fitting steel joints and girders high above the ground, or that a window washing concern must furnish its men scaffolding to use when doing their work. The danger in this case was inherent in the nature of the work, and we are not able to perceive how defendant could have removed or lessened this danger by any precaution it could take."

As to whether defendant here may be charged with negligence for failure to foresee that this bridge might prove to be an unsafe place for those of its employes required to work on it, the rule in Christianson v. C. St. P. M. & O. Ry. Co. 67 Minn. 94, 97, 69 N. W. 640, 641, stated by Mr. Justice Mitchell, in the lucid and accurate language for which he is famous, strikes me as still good law:

"* * * the law is that if the act is one which the party ought,

in the exercise of ordinary care, to have anticipated was liable to result in injury to others, then he is liable for any injury proximately resulting from it, although he could not have anticipated the particular injury which did happen. Consequences which follow in unbroken sequence, without an intervening efficient cause, from the original negligent act, are natural and proximate; and for such consequences the original wrongdoer is responsible, even though he could not have foreseen the particular results which did follow."

It is easy after the event to look back, as does plaintiff's counsel, and conjure various theories upon which negligence might be predicated in any given case. Here it conclusively appears that all railroads in this area have adopted and put into common use this type of bridge. Those engaged in that kind of enterprise have found that it meets their needs and requirements. As I see the situation, no one can say with any degree of assurance that defendant failed to exercise reasonable care and foresight for the safety of its bridge carpenters. We should not grasp and adopt as controlling the vague and untried theories of some doctrinaire, who under the guise of book expertness thinks that in cases of this type, where men are engaged at work high above the ground, they should be provided with safety belts, parachutes, or, if such work be high above the water, with rubber rafts. The observation made by William Hazlitt in "The Ignorance of the Learned," written more than a century ago (1821), has so much of a ring of truth that even now its quotation may not be amiss: "The most sensible people to be met with in society are men of business and of the world, who argue from what they see and know, instead of spinning cobweb distinctions of what things ought to be."

I am not disposed to question the amount of plaintiff's recovery if there is adequate proof to make the question of defendant's negligence one of fact. All humane sympathies are with the grandmother, from whose hearth and home Clifford was so tragically snatched. The liability act might well have been so written as to impose liability upon the employer if the injury or death of the

employe was the result of his employment and suffered while so engaged. In other words, there should be compensation placed upon the industry irrespective of whether the employer's negligence entered into the picture. If this were a compensation case, there would in all likelihood have been no litigation. But we must take the law as the lawmakers have given it to us. That is why, with genuine reluctance, I feel compelled to dissent.

UPON APPLICATION FOR REARGUMENT.

On May 19, 1944, the following opinion was filed:

STREISSGUTH, JUSTICE.

By petition for reargument, our attention is called to an exception by the defendant "to the instruction of the court with regard to the presumption of law that the deceased is in the exercise of due care *in the manner given by the court.*" Even if this exception be construed as directed to the giving of the instruction and not to the manner of giving it, there still would be no reversible error, for, as pointed out in our original opinion, there is nothing improper in a charge stating the presumption of law—exception or no exception. See "Charges on Presumptions and Burden of Proof," 5 North Carolina L. Rev. 291, 299; McMahon v. Flynn, 154 Minn. 326, 191 N. W. 902. The other questions raised were fully disposed of in the original opinion.

On June 23, 1944, the following opinion was filed:

PER CURIAM.

For the reasons set out in the opinions (Bimberg v. N. P. Ry. Co. 217 Minn. 187, 206, 14 N. W. [2d] 410, 419), rendered on the appeal by defendant from the order denying its motion for judgment notwithstanding the verdict or for a new trial, the judgment [No. 33,892] of the lower court is affirmed.