ANNA J. MURPHY, administratrix *vs.* BOSTON AND MAINE RAILROAD.

Middlesex.     February 5, 1946. — April 2, 1946.

Present: FIELD, C.J., QUA, DOLAN, WILKINS, & SPALDING, JJ.

*Negligence*, Employer's liability: place of work, railroad yard. *Proximate Cause. Evidence*, Matter of conjecture, Presumptions and burden of proof. *Practice, Civil*, Question of law or fact.

The standard by which is measured the amount of evidence necessary to carry to the jury a case under the Federal employers' liability act is that established by decisions of the Supreme Court of the United States.

Recent decisions of the Supreme Court of the United States have, in general, disclosed a tendency toward scrupulous avoidance of any

possible encroachment upon the sphere of the jury in the trial of actions under the Federal employers' liability act. Per QUA, J.

Evidence warranted a finding that, if one employed in interstate commerce in a railroad yard bordered by a river with a sea wall along its edge fell into the river and was drowned at a point where there was no railing or other guard on the wall, the railroad corporation was negligent in failing to provide a guard at that point on a rainy, windy night when the customary illumination by flood lights had been extinguished for the first time because of the war "dim out."

Findings, that one, employed in interstate commerce in a railroad yard bordered by a river with a sea wall along its edge, who disappeared on a certain night after leaving his work for a meal and after making a telephone call and was found drowned several months later, had fallen into the river on that night at a point where through negligence of the railroad corporation there was no railing or other guard on the wall and that such negligence was a proximate cause of his death, would not be based on mere conjecture, but would be warranted within the standard of proof laid down by the Supreme Court of the United States in actions under the Federal employers' liability act, where there was circumstantial evidence justifying an inference by the jury that in attempting to go back to his work after his meal he had taken a route leading him to such point on the wall.

TORT. Writ in the Superior Court dated March 6, 1944. The action was tried before *Brogna,* J.

*J. DeCourcy,* (*A. M. Knowles* with him,) for the defendant.

*T. C. O'Brien,* (*S. B. Horovitz & J. S. Stone* with him,) for the plaintiff.

QUA, J. The plaintiff has a verdict in this action under the Federal employers' liability act, U. S. C. (1940 ed.) Title 45, §§ 51–60, for the death of her husband, Mark J. Murphy, alleged to have occurred on or about December 1, 1942. The only exception of the defendant on which the case is here is to the refusal of the judge to direct a verdict for the defendant.

It is agreed or substantially admitted that the defendant was a common carrier by railroad engaged in interstate commerce; that the deceased was an employee of the defendant; and that his employment was in interstate commerce. The question to be decided is whether there was any evidence for the jury that while he was so employed his death resulted "in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or

by reason of any defect or insufficiency, due to its negligence, in its . . . appliances, . . . track, roadbed, works, . . . wharves, or other equipment." § 51.

There was evidence tending to show these facts: The deceased was a locomotive fireman who "held over twenty years' seniority." He was "a very devoted and good husband." On December 1, 1942, his work was on a "passenger switcher" which was making and breaking up passenger trains at the North Station in Boston. He had worked many times upon the switcher, doing work of a routine character which was substantially the same each night. He started for work in his automobile at about 1:30 o'clock that afternoon. He appeared normal and healthy. At five or ten minutes past seven in the evening he left his engine to get something to eat and started off along the platform toward the station gates. The engineer had told him that on his return the engine would be on "track A." The engine generally went to "track A" at about that time for a supper period. "Track A" began between two high loading platforms near that which was called at the trial the southerly side of the station, but which we suspect would be more accurately described as the easterly or northeasterly side. Proceeding away from the station in the direction of the draws over the Charles River, this track merged into another track which ran for a considerable distance along the edge of the river to the most easterly draw, known as "draw 1," and then over that draw. Between this last mentioned track and the river was a "catwalk" provided for persons walking to and over the draw. The "catwalk" began at a sea wall at the edge of the river near the station and ran out to "draw 1." The "catwalk" was provided with a metal railing along the river, but there was no railing, fence, or guard upon the sea wall at which the "catwalk" began. After the deceased left his engine at a few minutes past seven he was next heard from in a telephone call to his wife at about 7:30. They talked about "the children." He said he had finished his supper, suggested buying a Christmas present the next day, told his wife to "keep the pot on," that he would see her at eleven o'clock, and after some joking

said, "I've got to go now; it's getting late"; "I've got to get back now." Then she said "goodbye." In the meantime the engine had backed to the platforms on "track A," where the engineer and the head brakeman ate supper on the engine. As a general rule the engine left "track A" evenings at about 7:40. But on December 1 they waited as long as they could for the deceased, even after they had the signal to go out. But as the deceased did not come, they pulled·out over "draw 1" at about 7:50 preparatory to backing in again upon some other nearby track. There was a large reflector light on the rear of the tender, which shone back toward the station. In pulling out of "track A" the engine had to pass a signal twenty-five or thirty feet from the "catwalk." It would get the next signal three feet from the draw to permit it to pass over the draw. If that signal was against it, it "would stop east of the drawbridge, and you would be on the track nearest the sea wall." That track "runs along beside the catwalk and the catwalk is between that track and the metal railing." There was no evidence whether the draw signal was against the engine that night.

There was evidence that when the deceased came back from supper it was his duty to find his engine; and that if his engine had gone from "track A" he should go to the yard master's office, which was "between tracks 12 and 13 at the head of the depot near the draw," and find out where his engine was. It appeared that the night of December 1 was the first night of the war "dim out"; that the flood lights were out in an area which could be found to include the sea wall and the beginning of the "catwalk," and that there was "no lighting" at a point near the beginning of the "catwalk." The night was rainy and windy.

No witness testified to seeing the deceased alive after he left the engine to go for something to eat. His automobile was found in the vicinity of the engine house the next morning. On May 13, 1943, his badly decomposed body was discovered floating in the water of the Charles between Warren Avenue bridge and Charlestown bridge some distance below the railroad draws. There was evidence that

the cause of death was "asphyxia by drowning." There was evidence that the tide ebbs and flows gently in this part of the river, and very slowly on the bottom, but that there is a tendency for an object on the bottom to move gradually seaward. The bottom is muddy. The body of a person drowned in the Charles in December would remain on the bottom until spring, when warmer water would accelerate the formation of gas which would cause the body to rise.

The standard by which is measured the amount of evidence necessary to carry a case to the jury under the Federal act is, of course, that established by decisions of the Supreme Court of the United States. *Brady* v. *Southern Railway*, 320 U. S. 476, 479. *Shipp* v. *Boston & Maine Railroad*, 283 Mass. 266. Recent decisions of that court have, in general, disclosed a tendency toward scrupulous avoidance of any possible encroachment upon the sphere of the jury. *Tiller* v. *Atlantic Coast Line Railroad*, 318 U. S. 54, 67–68; *S. C.* 323 U. S. 574. *Bailey* v. *Central Vermont Railway*, 319 U. S. 350, 353–354. *Tennant* v. *Peoria & Pekin Union Railway*, 321 U. S. 29, 35. *Blair* v. *Baltimore & Ohio Railroad*, 323 U. S. 600, 602. *Lavender* v. *Kuhn*, 327 U. S. 645. See *Waddell* v. *Chicago & Eastern Illinois Railroad*, 142 Fed. (2d) 309, certiorari denied, sub nomine *Chicago & Eastern Illinois Railroad* v. *Waddell*, 323 U. S. 732; *Eglsaer* v. *Scandrett*, 151 Fed. (2d) 562. In the *Tennant* case, 321 U. S. at page 35, the Supreme Court said, "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable." Compare our own statement of the governing rule in *Smith*

*v. First National Bank,* 99 Mass. 605, 612, cited with many other cases in *Sargent* v. *Massachusetts Accident Co.* 307 Mass. 246, 251, or with the briefer statement in *Commissioner of Corporations & Taxation* v. *Bullard,* 313 Mass. 72, 89, "that the fact to be established must be shown to be more probable than any contrary fact." Compare also *Patton* v. *Texas & Pacific Railway,* 179 U. S. 658, 663–664, and *New York Central Railroad* v. *Ambrose,* 280 U. S. 486, 490.

We have no serious trouble in finding evidence of the defendant's negligence toward employees using the "catwalk" in the failure of the defendant to provide a guard of any kind for the retaining wall immediately next the beginning of the "catwalk" at a place where persons approaching the walk would naturally pass. *Cawman* v. *Pennsylvania-Reading Seashore Lines,* 110 Fed. (2d) 832, certiorari denied, sub nomine *Pennsylvania-Reading Seashore Lines* v. *Cawman,* 311 U. S. 666. *Bimberg* v. *Northern Pacific Railway,* 217 Minn. 187. *Southern Railway* v. *Wilmouth,* 154 Va. 582, 590. See *Baltimore & Ohio Railroad* v. *Berry,* 286 U. S. 272; *Kenney* v. *Boston & Maine Railroad,* 92 N. H. 495. Especially could such negligence be found in leaving this space unguarded on a dark, rainy, windy night, when the usual illumination had been for the first time withdrawn. There is nothing to show that "dim out" regulations required the complete extinguishment of all illumination. *Boston & Maine Railroad* v. *Cabana,* 148 Fed. (2d) 150, 153.

We apprehend the question of difficulty in the case to be whether there was any evidence for the jury that the deceased fell into the river at this point, so that negligence in leaving the wall unguarded could be found to have contributed to cause death. To answer this in the affirmative on the evidence in this case is to concede to the jury a very wide scope for the drawing of a chain of inferences. Nevertheless, we are of opinion that, at least under the rule now laid down by final authority, the necessary inferences could be drawn without entering the field of speculation or conjecture.

In the first place, any likelihood that the deceased committed suicide (an inference never easily drawn, *Bohaker* v.

*Travelers Ins. Co.* 215 Mass. 32, 36; *Travellers' Ins. Co.*
v. *McConkey*, 127 U. S. 661, 667) could be thought to have
been excluded by the wholly normal character of his ap-
pearance and acts and by the pleasant and natural conver-
sation with his wife over the telephone at almost precisely
the time when he was due to return to his engine.   The
same considerations, together with drowning as the cause
of death, tend to exclude sudden illness.   And there would
seem to be little probability of a workingman in the vicinity
of the North Station meeting with foul play of a kind which
would result in death by drowning.   If the jury set these
possibilities at one side, they would fairly be brought to
consider whether the deceased, immediately after the tele-
phone talk, attempted to return to his engine, as it was his
duty to do in the regular course of his employment.   This
would certainly seem the most natural thing for a man in
his position to do, especially as it could be found that he
had just told his wife that he had "got to get back now"
and had intimated that his time was getting short.   If the
jury found that he went back for his engine they could, of
course, find that he went to "track A," where he expected
his engine to be.   They could find that his engine had left
"track A," and from the time sequence shown above they
could find that it had been gone only a very short time.
They could find that it had taken the track which lay im-
mediately beside the "catwalk."   It is possible that the
deceased could see the reflector light upon the tender as it
receded toward the draw, but if not, the jury could find
that he knew enough of the engine's routine movements
to know that it must pass on the track adjoining the "cat-
walk," that it might be required to wait for a signal at the
draw, and that in any event it must stop and reverse itself
immediately after passing the draw and come back on a
nearby track.   The unguarded wall and the beginning of
the "catwalk," according to a plan in evidence, were be-
tween fifty and one hundred feet in the general direction
of the draw from the end of the high platform of "track
A."   If the jury found that the deceased tried to return to
his engine, we think they could find that he either tried to

follow it from "track A" toward the draw by means of the "catwalk" in the hope of catching up with it, if it should be delayed, or of meeting it immediately on its return across the draw, where the tracks were fewer in number and closer together before they diverged into the station, or that he started for the yardmaster's office to ascertain its whereabouts. It would be much nearer in going to the yardmaster's office to use the "catwalk" for about half the distance to the draw than it would be to go back through the station. Any route which the deceased would be likely to take to the yardmaster's office, other than by the "catwalk," would carry him away from the river bank and it is difficult to see how he could have been drowned. The jury could find that whether the deceased went directly for his engine or intended first to call at the yardmaster's office he took a route which caused him to approach the unguarded wall at the beginning of the "catwalk," and we think they could find that in the darkness and rain he fell into the river at that point. *Von Ette's Case*, 223 Mass. 56. Such a finding would be consistent with the discovery of the body at the time and place where it was discovered and in the condition in which it was discovered. It would be consistent also with death by drowning rather than through any form of violence, and it would be consistent with the complete disappearance of the deceased almost immediately after he telephoned his wife. We think the jury could find that the disappearance of the deceased was the result of falling from the unguarded wall into the river on that same night shortly after his talk with his wife. So far as we can perceive the evidence offers no other explanation as to how the deceased could get into the river at the North Station that night which would be consistent with an attempt on his part to return to his engine and to resume his duties in due course and which would not be open to the objection of improbability. Moreover, the jury took a view, and this would seem to be a case where a view might shed substantial light upon the course likely to be taken by the deceased from "track A" to find his engine. *Smith* v. *Morse*, 148 Mass. 407, 410. *McMahon* v. *Lynn & Boston Railroad*, 191 Mass. 295, 299.

*Keeney* v. *Ciborowski*, 304 Mass. 371, 372–373.  *Berlandi* v. *Commonwealth*, 314 Mass. 424, 451–452.  *Snyder* v. *Massachusetts*, 291 U. S. 97, 113.

If the jury made the findings which, we think, at least according to the standard of proof laid down by the Supreme Court of the United States, they were warranted in making, it would follow that the death was occasioned while the deceased was employed in interstate commerce (*North Carolina Railroad* v. *Zachary*, 232 U. S. 248, 260; *Erie Railroad* v. *Winfield*, 244 U. S. 170, 173; *Watkins* v. *New York, New Haven & Hartford Railroad*, 290 Mass. 448, 449–450, and cases cited), and that the only other necessary elements of negligence and cause "in whole or in part" were present.  See *Sargent* v. *Massachusetts Accident Co.* 307 Mass. 246; *Bly* v. *Southern Railway*, 183 Va. 162; *Krell* v. *Maryland Drydock Co.* 184 Md. 428.  The case of *Cowdrick* v. *Pennsylvania Railroad*, 132 N. J. L. 131, certiorari denied, 323 U. S. 799, upon which the defendant relies, seems to us distinguishable on the ground that in that case there was no evidence of any defect or of any negligent conduct on the part of the defendant.

*Exceptions overruled.*