PATRICK 'NASH, Appellant, *vs.* THE CITY OF SAINT PAUL, Respondent.

APPEAL FROM THE DISTRICT COURT OF RAMSEY COUNTY.

Under the Charter of the City of St. Paul, as amended by the Act of Feb, 27, 1856, the power of the Street Commissioners to order and contract for the grading of a street did not depend upon the making or filing of the estimate of expenses provided for by section 6 of chapter 7.

The owners of the adjoining lots upon which the expense of the grading was assessed, were alone interested in such estimate, and the failure to make or file it might vitiate the particular assessment, but would not invalidate the contract for doing the work.

Therefore in an action on a contract for grading, it was not necessary for the Plaintiff to allege that such estimate had been made or filed.

It is necessary to allege that the contract sued upon was made with the lowest bidder for the work ordered to be done.

## Points and Authorities of Appellant.

I.—The objection taken to the complaint by the Defendant is, that it does not state that the Street Commissioners, having determined to make a public improvement, " caused to be made an estimate of the whole expense thereof, and of the proportion to be assessed to each lot," or that " such estimate was filed with the City Comptroller for the inspection of parties interested," according to the terms of *sec.* 6, *chapter* 5, *p.* 29 *of the Charter of the City of St. Paul.* The Defendants claim that the complying with the terms of that direction was a condition precedent to the power of the Street Commissioners to enter into contract. *Secs.* 3, 4, 5 *and* 6 *of the City Charter.*

The Defendant claims that the final clause of section 6 limits the power or authority of the Commissioner to contract, to cases where they have complied with the requirements of that section, and that the complaint stating no such compliance, is bad.

*First*—Granting the Defendant to be correct in his position that such fact must exist, still the complaint would not

thereby be rendered bad.    It would be mere evidence.    The allegation is, that the Defendant made the contract.    Anything else would be evidence merely and not properly pleadable.

*Second*—The section, however, does not affect the validity of the contract.

It will be observed, on looking at the charter, that two separate and distinct things are therein provided for and required to be done by the Street Commissioners.

1st. The making, grading, &c., of streets, alleys, &c., is to be done, and the contracting for the same is to be done by the Street Commissioners.

2d. The expense of making these improvements is to be assessed in a particular manner, and the Street Commissioners are the Assessors.    *Brady vs. The Mayor of New York*, 2 *Bosworth*, 173; 20 *N. Y.*, 312; 22 *ib.* 162.

*Third*—The following sections of the charter show the construction we have claimed in our second point to be the true one.

Upon the construction claimed by the Defendant, the Commissioners would have power to contract immediately after the filing of the estimate.    Suppose they had so done, and that afterwards proceedings had been taken by the lot owners, under section seven, would such proceedings have had any effect upon the contract?

Would the contractor have had any interest or any right to appear in such proceedings?

And if not, then, it seems that subsequent proceedings on the estimate have no more reference to the contract than the contract had to the estimate.    In other words, that they are distinct, independent transactions, having no relation to each other.


Points and Authorities of Respondent.


I.—The complaint does not show any contract, express or implied, whereby the City of Saint Paul was obligated to pay for the work done or to be done thereunder.

The city could not contract to pay for street grades ; such

work is to be paid for by property owners whose lots front the street. *Secs.* 1, 3, 5, 6, 7, 8, 10, *chap.* 7, *Charter City Digest*, 1856, *pp.* 27 *to* 31.

II.—The contract was not made by or on behalf of the City, but by certain Street Commissioners of one of the wards of the city, in their own names. Such Street Commissioners act as trustees of the public and of the property owners interested in their respective Wards. *See secs. of Charter above cited.*

III.—Said Commissioners acted without authority, it not appearing by the complaint that the preliminary estimate required by the Charter to be filed before the Commissioners may contract, was ever filed, nor that the work was let to the lowest bidder, upon notice. *Sec.* 6, *chap.* 7, *sec.* 1, *chap.* 10, *Charter City Digest, pp,* 29, 43.

These preliminary acts are necessary to confer jurisdiction on the Commissioners, and these facts, showing the authority of the Commissioners to contract, should be averred. And a corporation must contract in the mode required by statute, or its charter. 5 *Denio, p.* 567; 5 *Minn.,* 104; 2 *Minn.,* 295; *Angel & Ames on Corporations, sec.* 291; 4 *Eng. Law and Eq.,* 426, 429; 7 *Eng. Law and Eq.,* 505; 16 *Eng. Law and Eq.,* 180; 2 *Cranch.,* 127; 2 *Denio, p.* 110; 3 *Wend.,* 573, 583; 4 *Peters,* 152; 13 *Peters,* 520; 2 *Bosworth,* 173, *affirmed in* 20 *N. Y. Court of Appeals,* 312; 5 *Minn.,* 286, 288.

The contract was therefore merely void. *Brady vs. Mayor of New York, and authorities before cited.*

IV.—The Plaintiff was bound to take notice of the defect or excess of authority in the Commissioners. *See authorities on* 3*d point.*

V.—The void acts of the Commissioners were incapable of ratification by the City and could not work an estoppel. *See authorities on* 3*d point.*

VI.—The contract was a specialty, and being without the corporate seal, it could in no sense be claimed as the contract of the corporation. *Angel & Ames on Corporations, sec.* 295.

VII.—The Plaintiff cannot recover in this action without violating the provisions of the charter forbidding such a liability. *Proviso of sec.* 10, *chap.* 7, *Charter City Digest,* 1856, *p.* 32, and such a provision in the charter is valid.

*Angel & Ames on Corporations*, secs. 216, 385; 1 *Black's Com.*, 475.

VIII.—It does not appear that the Plaintiff proceeded properly with the work, inasmuch as he should have shown that he commenced and completed the part of the work between Jackson and Robert streets, the Commissioners having the right to suspend the balance of the work thereafter ; nor does it appear that the obstructions complained of were upon that portion of the work to be first completed aforesaid.

IX.—If the action cannot be sustained against the City on the contract, it cannot be sustained on a "*quantum meruit*," because it does not appear what the work was reasonably worth, and it does not appear that the Plaintiff was fully paid for what the work was worth, nor could the City in such case be bound except by express contract under the corporate powers.

X.—The resolutions of Council complained of (if the Plaintiff had a right to proceed) were null and void, and were not regarded by the Plaintiff, and his conduct was not influenced thereby. and the obstructions complained of existed at the time of the alleged contract.

XI.—It appears that the Plaintiff voluntarily abandoned the work before the completion of his contract.

WHEELER H. PECKHAM, Counsel for Appellant.

HORN & FLINT, Counsel for Respondent.

*By the Court.*—EMMETT, C. J.—This is an action brought to recover a balance alleged to be due for work done under a contract for grading a street, entered into between the Plaintiff and the City of Saint Paul, the Defendant. The contract appears to be dated the 5th day of August, A. D. 1857, and countersigned by the Comptroller of the city on the 6th of October following.

The Plaintiff alleges the making of the contract and the doing of a certain amount of work thereunder, upon which he admits payments to a specified amount; that he was ready

and able to complete the job according to the terms of the contract, but was prevented from so doing by the interference of the Defendant, who stopped the work, and refused to let the Plaintiff proceed therewith. That by reason of the non-completion of said work the Defendant is not authorized to issue to him, the Plaintiff, certificates upon the adjoining lots, in payment, as provided by the charter of said city. And that had he been permitted to finish said work, and said certificates been issued to him, they would have been worth their face in money. Upon these allegations he demands a judgment against the Defendant for the balance due for the work done, at the contract price, after deducting the payments admitted to have been received.

The Defendant demurred to the complaint, and the District Court sustained the demurrer. The Plaintiff then appealed to this Court.

The objection made by the demurrer is, that the complaint does not state facts sufficient to constitute a cause of action; and the principal ground relied upon in the argument is, that the complaint does not allege that an estimate of the whole expense of the work to be done, and of the proportion thereof to be assessed to each lot, was ever made and filed, as required by the charter; nor that the contract was let to the lowest bidder.

The decision of this appeal properly depends upon this simple question of pleading, but the parties on the argument in this Court were willing to waive any advantage which either might gain thereby, and desirous of getting at once to the question upon which their rights must ultimately be determined. The case was therefore presented and argued as though the complaint alleged that the contract had been let to the lowest bidder, but admitted that the estimate spoken of had never been made or filed.

The Defendant's counsel insists that the making and filing of these estimates were conditions precedent to the power of the Street Commissioners to enter into the contract, and bases his position upon section 6, chapter 7, of the City Charter, which is in the language following:

"Sec. 6. Whenever the Commissioners shall determine to

make any public improvement, as authorized by sections three, four and five of this chapter, they shall cause to be made an estimate of the whole expense thereof, and of the proportion to be assessed to each lot, which estimate shall be filed with the City Comptroller, for the inspection of parties interested. *The said Commissioners shall thereupon enter into contract for the doing thereof.*"

Sections three, four and five, referred to in said section six, read as follows:

" SEC. 3. The Street Commissioners shall have power to order and contract for the making, grading, repairing and cleansing of streets, alleys, public grounds, reservoirs, gutters and sewers, within their respective wards, and to direct and control the persons employed therein.

" SEC. 4. Whenever the Street Commissioners shall deem it necessary to construct or repair any sidewalk within their ward, they shall direct the owner or occupant of any lot adjoining said sidewalk, to make or repair the same, at his own proper cost and charge. If such work is not done in the manner and within the time prescribed, the Commissioners shall cause the same to be done at the expense of the lots adjoining such sidewalk.

" SEC. 5. The cost and expense of surveying streets, alleys, sidewalks, sewers, and of estimating work thereon, and of repairing and cleansing streets and alleys, and of constructing and repairing reservoirs and sewers, shall be chargeable to and payable out of the fund of the proper ward; opening, grading, gravelling, planking or paving streets and alleys, to the centre thereof, shall be chargeable to and payable by the lots fronting on such street or alley. Sewers may be ordered. * * * * * "

We will be greatly aided in giving the proper interpretation to the last clause of section six, as above recited, and may account for its appearance in that connection, by examining somewhat into the amendment which the section has undergone. Prior and up to February 27, 1856, the section read as follows:

" SEC. 6. Whenever the Commissioners shall determine to make any public improvement, as authorized by sections 3, 4

and 5 of this chapter, they shall cause to be made an estimate of the whole expense thereof, and of the proportion to be assessed and charged to each lot ; *and in case of grading streets, alleys or sidewalks, of the number of cubic yards to be filled in, or to be excavated in front of each lot ;* and such estimate shall be filed with the City Comptroller, for the inspection of parties interested. *The Street Commissioners shall give notice, by advertisement, for ten days, in one or more papers published in St. Paul, to the owner or occupants of the lots or parcels of land fronting on any street, alley or sidewalk ordered to be graded, gravelled, planked or paved, requiring them to do the work mentioned in such notice, within a reasonable time, therein to be specified ; and if the said work shall not be done within such time,* the said Commissioners shall enter into contract for the doing thereof."

While this section remained in the terms just recited, it appears that all improvements chargeable to the adjoining lots were first required to be made by the lot owners themselves. They were therefore to be duly notified by advertisement to do the work specified, within a reasonable time therein named, and it was only in case of a failure on the part of the lot owners, that the Street Commissioners had a right to make any contract concerning such improvements. But to enable the owners of lots to determine whether it were better for them to make the improvement themselves, or suffer the city to do it for them, and it may be also to enable them to ascertain whether the cost thereof assessed to them would exceed the benefit which their lots would derive from said improvement, the Street Commissioners were required to cause certain estimates to be made and filed for the benefit of parties interested.

The sole object of restraining the Commissioners from contracting for such work, in the first instance, seems to have been to enable the lot owners to do the work themselves, if they saw proper. Their power to contract, however, does not appear to have depended in the least degree upon the making or filing of the estimate, but wholly on the fact of the owners having failed to do the work, after due notice—(and there is no pretence, in this case, that such notice was not

given.)   It is true that the failure to make and file the esti-mate might defeat the particular assessment, if the owners of the lots assessed should contest it on that ground; but we cannot see how it would affect the validity of a contract en-tered into by the Commissioners, after the lot holders had failed, upon due notice, to make the improvement themselves; because the setting aside of any assessment, on such grounds, would only result in an assessment *de novo*.   That no such importance as the Defendant claims was attached to the esti-mate, is apparent from the fact, that in the instance of con-structing, altering and repairing wharves, and grading and paving the banks of the river, authorized by section 9 of the same chapter, the expense of which was then chargeable to the lots extending to the river, no estimate of the expense was required prior to the letting of the contract, but only the no-tice to the lot owners first, to cause the work to be done. And it will also be observed that where the cost of any im-provement was not chargeable to the adjoining lots, the Street Commissioners were not restrained, even by section 6, from making the contract without such estimate.

It was found by experience, however, that while very few persons accepted of the doubtful privilege of making these improvements themselves, the time which necessarily expired in waiting for the lot owners to do the work in front of their lots, was time lost to the city.   These and other considera-tions not necessary to enumerate, induced the legislature to change the policy in this respect, and to authorize the city to make the contract in the first instance.   This object they en-deavored to effect by simply striking out of said section 6 all that related to the lot owners doing the work themselves; but by adhering too strictly to this course, the last clause of the section was left standing alone; and as it had never had the re-motest connection with any portion of the section, except the part stricken out, it was thus rendered utterly meaningless and nonsensical; from which condition it was not wholly re-deemed, even by the introduction of the word " thereupon." This word had the effect of making the isolated sentence read a little more smoothly; but we have no idea that the legisla-ture intended thereby to effect so radical a change in the for-

mer policy as to make the right to contract for any of these improvements, even such as were payable out of the ward or city funds, dependent upon an unimportant estimate not previously made essential. Had any such change been contemplated, it would doubtless have been clearly expressed ; and most certainly would have been made to extend also to the improvements authorized by section 9 of the same chapter, which may still be contracted for without an estimate of any kind, although it would have been of service to the city here, if anywhere. It is by implication merely (and an implication arising solely from the connection in which the clause alluded to, is to be found,) that any intention to restrain the making of contracts until the estimate is made and filed, can be inferred. But if that connection, and even the presence of the clause itself, can be otherwise satisfactorily accounted for—the presumption of any such intention is rebutted. We are satisfied that the legislature intended by the amendments then made to the charter, to enlarge, instead of restrain the powers of the Street Commissioners; and that no change was contemplated by the amendments made to said section 6, beyond authorizing the city to contract for improvements chargeable to adjoining lots, in the first instance, and without waiting to see whether the owners will do the work themselves, as was formerly required. It is our duty, therefore, to interpret said amendment according to · the intention of the law makers, and not give it an effect never contemplated by them.

It is readily admitted that a statute which delegates a special authority to particular persons, or an inferior· tribunal, must be strictly pursued, if thereby the property of individuals may be affected against their will. Numerous cases are reported wherein the least departure from the strict letter of the law has been held fatal to the execution of such a power. They are, however, mostly cases involving the validity of tax sales, in which such a course becomes necessary in order to prevent the sacrifice of property for a grossly inadequate consideration, by summary process, and perhaps upon constructive notice only. The policy of the Courts in requiring so great a degree of strictness in all such cases, needs no defence

at this day. Their ruling has been uniformly in the interest, so to speak, of the individual citizen, and to protect him against the State or the public, so that his title may not be subverted as a penalty for an alleged violation or breach of revenue regulations. But where the action is against the public, and to hold it responsible for what is done by its order and authority, no such reasons exist for adhering to this strictness. And it is believed that no well considered case can be found where, (its agents having authority to make the contract, or do any other act, which became the subject of an action,) the public has not been held to the same degree of liability that an individual would have been subjected to under the same circumstances.

There are, it is true, instances where it has been held that a municipal corporation is not liable for work done under an unauthorized contract made with its agents, and that it could not ratify or confirm such a contract, so as to incur a liability thereon. The case of *Brady vs. The Mayor of New York*, 2 *Bosworth*, 173, afterwards affirmed on appeal and reported in 20 *N. Y.*, 312; and the case of *Bonesteel vs. The Mayor of New York*, 22 *N. Y.*, 162, so confidently relied on by the Defendant's counsel, are cases of this character. But these decisions are based upon the ground that there was no contract, because there was no power to make a contract in such a manner. And if the corporation had no power to make, it of course could not ratify or confirm such a contract so as to become liable thereon; because ratification or confirmation implies a power to have made the contract originally, which power it was decided did not exist in those cases. On grounds of public policy, therefore, and as the course necessary to be taken in order to insure an observance of such restrictions as municipal charters impose upon the power given to its agents to make contracts, it has been held that such a power must be strictly pursued in order to bind the corporation; and that to permit such a defect to be caused by a subsequent ratification or confirmation, would leave all restrictions upon the power to contract, a dead letter upon the statute; because in this way the agents might bind the corporation by any contract which they might see proper to make, whether they had au-

thority or not. And if they would contract in defiance of charter restrictions, they would seldom hesitate to confirm a contract thus made, if that alone would render the action valid.

The correctness of the rulings in the two New York cases above referred to, will not, I think, be disputed, but they are by no means decisive of this case. There the restrictions to be observed went directly to the contract itself and the manner of making it. The agents were authorized to contract in a particular manner only. In this case, however, we do not think that the right to contract was contingent upon the making or filing of the estimate, (which was the thing omitted), although the assessment might be entirely vitiated by such omission. A general power to order and contract for the grading of streets is conferred by section 3 of the charter, which is in no way limited by section 6, as amended by the act of February 27, 1856 ; and but for limitations elsewhere to be found, the Street Commissioners could have bound the city by any contract for grading, made in good faith, without regard to the manner or form in which it was made.

If there was no want of power to make this contract, is it avoided by reason of any neglect or refusal on the part of the city to do what was necessary to enable it to enforce assessments against the lots charged with the expense of such grading ?

The general proposition that all public improvements ought to be paid for out of the public funds, will not be seriously controverted ; and where nothing is said in the law authorizing an improvement, about any other mode of payment, it is made as of course at the public expense ; and, we may add, all improvements made by authority of municipal corporations are presumed to be, as they are ostensibly, public improvements, and must ordinarily be paid for by that public in whose interest and by whose authority they are ordered to be made. It has not been unusual, however, to insert in municipal charters and sometimes other laws, a provision by which the public may be relieved of a portion, or all of the expense of certain improvements deemed of great or exclusively local or private advantage, by throwing it on the par-

ticular locality or the particular property benefitted. The justice and propriety of such a course has long been questioned, and even its constitutionality doubted, although acts of this character have received judicial sanction in some of the States. *Smith's Com. on Statutory and Constitutional Construction*, 470. But our Territorial Legislature, when incorporating the city of St. Paul, not only discarded all doubts on the subject, but actually reversed the natural order of liability above mentioned, by first giving to the city authorities full power and authority to order and contract for the making of certain improvements, without regard to the wishes of adjoining lot owners, and then deliberately saddling the lots with the whole burden of expense, unless the owners could show to the satisfaction of a jury empanneled to try the question, that the expense assessed to their lots exceeded the benefits which they derived from the improvements; in which case it was graciously consented that the public, or the city, might bear a portion of the cost. It will hardly be expected that courts of justice would strain a point in order to give effect to so bold an innovation.

Had the charter simply authorized the city to order and contract for the grading of streets, saying nothing about how the means of payment were to be obtained, the city at large, as we have before stated, would have been liable; and I cannot see how the liability is in any degree lessened because it also provides that the cost of such grading shall be assessed upon the lots adjoining such improvement; for whether the cost is defrayed by a general tax upon all, or by an assessment upon particular property, it is equally the plain duty of the city to employ the means necessary to secure funds for the payment, and it cannot escape responsibility by neglecting its duty in this particular. Where work is done by order of the city, which is payable out of the general fund or chargeable upon all the taxable property in the city or ward, no one would seriously insist that the contractor who performs the work, must see to it that the tax is properly levied, or get nothing for his labor. Why then should his right to compensation be prejudiced by the failure of the city to do whatever is necessary to enforce an assessment against particular

lots, when the expense of the improvement is chargeable to them? In either case he contracts with the city only, and looks to the city alone for payment; and it can make no manner of difference to him how the means to make such payment are to be obtained. He is not particularly interested in the estimates of the expense, etc., nor can he in any manner interfere in regard to them. His legal rights are determined by his contract alone, and his contract is in no way effected by or dependent upon the estimated cost. He is not required to refer or in any way look to the estimate. His bid for the job is not necessarily founded upon it; for he may obtain it at a price far exceeding or greatly below that upon which the estimate is made. And although a certificate may be given him of the amount assessed on the several lots, he has no means of enforcing payment—no personal claim against the owner, but must, if it is not paid voluntarily, depend altogether on its being collected by the city, with other taxes.

It is obvious that the lot owners alone are interested in this matter of estimates, as the provision requiring them to be made was inserted for their benefit solely; and it seems equally plain that they alone can take advantage of any omission in regard to it. It is by means of the estimate alone that they are enabled to learn the proportion of the expense charged to their individual lots, and thus, by referring to the price at which the work is let to contract, to determine whether the benefit to them is equal to the expense charged to their lots. And if by any neglect of the city in causing an estimate to be made, lot owners are deprived of an opportunity to transfer a portion of the expenses charged to their lots upon the ward or city, as provided by section 7, they may rightfully complain; but it does not become the party guilty of such neglect to claim any benefit or exemption because of the omission. Regularity of proceeding is essential to the enforcement of any tax, whether it is by general levy or assessed upon particular property; but I do not see how a mere irregularity in making the levy or assessment can affect the validity of the contract which precedes it. It may be fatal to the collection of the tax, but the authorities are not necessarily prevented from afterwards collecting it by proceeding

in a proper manner. And although payment to a contractor may thus be deferred, yet he has no right to interfere, directly or indirectly, in any of the proceedings for enforcing the collection; and it would be hard, indeed, if the public could afterwards plead its own negligence in bar of an action brought by him to recover for work done under a contract. One could hardly imagine a more glaring example of a party taking advantage of his own wrong, than such an instance would afford; and were such a plea held sufficient, it would be almost impossible to conceive a case in which the public might not thus escape liability for work done in its behalf and by its authority.

We are of opinion that under the charter of the city of St. Paul, as it existed at the date of the contract set out in the complaint in this case, a person contracting with the city to do any work which the city was authorized to order and contract for, might look to the city alone for payment; that it was the duty of the city authorities to see that the means therefor were provided, in the manner pointed out by the charter; and that the right of the contractor to compensation, in accordance with his contract, was not affected by any omission on the part of the city to make a legal assessment of the cost of such work upon the property or persons chargeable therewith. And it is not unworthy of remark, that the Legislature, at the next session after the making of this contract, and while the parties were proceeding under it, so amended· the charter as to put this construction beyond all doubt, as to future transactions. *Special Laws of* 1858, *chapter* 1.

But we are further told that the city cannot possibly be made liable to pay for work done under this contract, because it was ordered to be done at the expense of adjoining lots; and section 10 of said chapter 7, contains this proviso: " That in no event where work is ordered to be done at the expense of any lot or parcel of land, shall either the city or ward be held responsible for the payment thereof."

This is but another evidence of the·intention of the Legislature to relieve the city as far as possible from all liability on contracts, which it had almost unlimited power to make.

We do not propose discussing either the propriety or validity of such a proviso. It has already been stated, and I think will hardly be denied, that but for the special provisions of the charter, the whole cost of every improvement would naturally fall upon the city at large, by whose order and authority it is made. The exemption, in any degree, of the city from this just liability, may be said, therefore, to be purely statutory and arbitrary in its character; and, the exemption removed, the liability remains or returns. A sufficient answer to the point under consideration may, therefore, possibly be found in the fact, that since the making of this contract, while the work was in progress under it, and, for aught that appears to the contrary, before any labor which has not been fully paid for was done by the Plaintiff, the proviso above recited was unconditionally repealed.

But in addition to this, the primary liability of the city of St. Paul to pay for improvements assessed upon particular property, and the right of parties interested to maintain an action against the city when it neglects to collect such assessments, was fully recognized by this Court in the case of *Daley vs. City of St. Paul*, 7 *Min.*, 390. That was a case where, by special act of the Legislature, commissioners were appointed to lay out a street over private property. And by the terms of the act, the expenses thereof, including the value of the land taken, and all damages otherwise occasioned by said improvement, was to be assessed upon the property benefitted thereby. A portion of the street was within the city of St. Paul, and, as to that part, it was made the duty of the city to collect the assessments. This, however, the corporate authorities neglected or refused to do, and, thereupon, one of the parties interested brought an action against the city, alleging the laying out of the street—the taking of her land therefor—the damages awarded—and the neglect of the authorities to collect the assessments.

The Defendant demurred to the complaint, and it was held by the two justices who heard the case, that the action would lie, and that the city became the debtor for the land taken within its limits.

These are all the questions which we deem it necessary to

examine in this case, although other points are made in the briefs submitted. There is, however, a question back of all others, to which we have invited the attention of counsel, but which, in the view we have taken, it did not become necessary to decide. And that is, whether, since the adoption of the constitution, a tax of any kind upon property can be levied or assessed otherwise than upon all the property in the district, and according to the cash value of such property. We have decided this case upon the assumption that assessments may rightfully be made, as provided in the city charter, upon the lots adjoining certain improvements, and we allude to the constitutional question above mooted, simply to prevent the inference that it was considered and decided in this case.

As to the question of pleading, the only question involved in this case, and which must govern the direction the case must take at this time, we hold that the Plaintiff was not bound to allege the making and filing of the estimate, so often mentioned, because, as we have endeavored to show, that is a matter between the city and the tax payers only, which, if omitted, may vitiate the tax or assessment, but does not necessarily affect the contract. But in regard to the objection that the complaint does not show that the contract was let to the lowest bidder, the case is quite different.

A municipal corporation does not inherently possess the power to order and contract for the grading of streets. The power to make such a contract is given by the charter of the city of St. Paul, but it can be made with the lowest bidder only, after giving due notice of the time and place of letting the contract. The case of *Brady vs. The Mayor of N. Y.*, before referred to, holds directly that if a contract is not so made the corporation cannot be held; and the reasoning in the opinion amply sustains the holding. It is plain that such a contract may be entered into by the city with a person other than the lowest bidder, as was done in the New York case just mentioned, but it would be unauthorized and void. To allege, therefore, the making of the contract simply, is not sufficient, because it may not have been with the lowest bidder. Nor is it enough to allege that it was awarded to the Plaintiff *as* the lowest bidder; because the allegation may be

literally true, and yet, for all that, the Plaintiff may not have been the lowest bidder in point of fact. The fact is too important to be left to inference merely ; it should be positively stated, so that issue may be taken upon the allegation. It is not a fact which is merely evidence of the execution of the contract, but goes to the authority by which the contract is made, and should, therefore, be alleged as well as proved.

On this ground, therefore, the judgment of the District Court·sustaining the demurrer, is affirmed, and the case remanded with directions to permit the parties respectively to amend.