# WILLIAM H. PROPPER v. CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY.[1]

August 1, 1952.

No. 35,706.

[1]Reported in 54 N. W. (2d) 840.

*Philip Stringer, Arthur J. Donnelly,* and *Sullivan, Stringer, Donnelly & Sharood,* for appellant.

*William T. Tautges* and *Amherst Tautges,* for respondent.

MAGNEY, JUSTICE.

Plaintiff, William H. Propper, in a personal injury action recovered a verdict of $45,000. Defendant, Chicago, Rock Island & Pacific Railroad Company, appeals from an order denying its alternative motion for judgment notwithstanding the verdict or a new trial.

Plaintiff, a brakeman-conductor employed by defendant, sustained injuries as the result of a derailment of a freight train engaged in interstate commerce. He brought action under the Federal Employers' Liability Act. The train consisted of 52 loaded cars, one empty, a caboose, and a locomotive and tender. Exclusive of the engine and tender, the weight of the train was 3,100 tons. The weight of the engine was in excess of 100 tons, the engineer estimating it to be 230,000 pounds. The accident took place on May 9, 1950, about 8 p. m. about three and a half miles north of Kremlin, Oklahoma, a station located on defendant's Oklahoma division. The train was northbound and plaintiff was its conductor. About 1,600 feet south of the place of the accident, the railroad tracks cross the Wild Horse Creek over bridge No. 3263. The flow of the stream is from southwest to northeast. A short distance north of the place of the accident, probably 150 to 200 feet, the railroad tracks cross another smaller watercourse over bridge No. 3260. Between these two bridges, over part of the distance, the tracks are laid on an embankment known as a "fill" about 12 feet high. Four to four and one-half inches of chat ballast was used. This embankment is 20 to 22 feet wide at the top and 60 feet wide at the base. The track, 4 feet 8½ inches wide, is located in the center of the fill. The sloping sides were covered with grass and weeds. The length of the fill between the two bridges is 700 to 850 feet. About 500 feet south of bridge No. 3260 there is a cut, and south of the cut there is another fill near bridge No. 3263.

This line of railroad was constructed about 1889. The base material was composed of clay and sand, a type of material commonly used in Oklahoma for road projects. It seems that as originally constructed a third bridge was located at the place where the accident occurred. The original natural course of Wild Horse Creek crossed the right of way at this point. Later, before 1908, a change was made in the roadbed, and the bridge was removed and a fill made. The course of the creek was straightened so as to flow entirely on the east side of the tracks: In general, the territory in the immediate vicinity of the place of the accident was more or less low and flat, somewhat higher on the westerly than on the easterly side. General drainage was northeasterly. Wild Horse Creek was the natural drainage for considerable territory and at times of heavy rainfall it would overflow its banks and the land on both sides of the railroad embankment would become flooded. Just south of the place of the accident and to the west of the embankment is a crescent-shaped slough or bayou which is sometimes dry but which usually contains stagnant water four to eight feet deep. The greatest distance between the bayou and the embankment is about 300 feet. This is mostly low ground. In times of extremely high water, when Wild Horse Creek overflows its banks, the excess water flows through the bayou and passes out through its north end, then down the watercourse under bridge No. 3260 to Wild Horse Creek again. The sketch here reproduced gives a clearer picture of the situation.

The train was proceeding northerly at a speed of 50 miles per hour. The conductor had received no slow order. It was dark at the time. The headlight of the oil-burning steam engine lit up the right of way approximately 800 to 1,000 feet ahead. Everything appeared normal ahead. The train, which was being operated within the prescribed speed limit for that stretch of track, had been running smoothly, with no flat wheels and air brakes all coupled. The engineer described what happened as follows:

"Well, I was looking straight ahead down the track with my head out of the cab window, looking ahead through a clear view

Appeal Exhibit 1
Propper vs. Chicago, Rock Island, etc R. Co.

window, and all at once it seemed as the engine hit something solid, * * * that knocked me ahead against the window, and about just a second later the slack of the train ran into the engine, and as it did so it seems as the front end of the engine lifted up and came up off the ground; it seemed that way; I think it did, and it rode very rough and I knew there was something wrong, and, of course, when that slack of the train ran in it knocked me off the seat, * * *—

* * * * *

"—so I looked around after I got ahold of that quadrant [throttle], and as I looked around I seen fire break out to the rear, and then I felt the engine kinda' come down, weave a little and begin gradually to turn over to the left. The engine came right on down on the ties—partly on the ties—turned over on the left side of the track. It was clear of the end of the ties when the engine landed on its side."

The fireman and head brakeman, both of whom had been in the engine cab, lost their lives. After the accident, a large hole was found in the embankment 60 or 75 feet long, 10 or 12 feet deep, and extending all the way across. The whole embankment for that distance was gone. Many of the freight cars were tankers carrying gasoline. Fire broke out almost instantly and burned with great intensity. The gasoline spread over the water in the bayou and ignited there. Twenty-seven cars piled up in the hole in the embankment and burned. Six more were derailed near the rear of the train. The caboose and nine cars ahead of it remained on the rails.

The accident happened on May 9, 1950. Between May 4 and May 7, seven inches of rain had fallen in the vicinity. On May 7 there was a fall of 4.5 inches. As a result, Wild Horse Creek rose to a considerable height. On the morning of May 8, section foreman Franklin C. Guffey said he could tell that the creek was rising. By noon it had risen quite a bit, was out of its banks, and spread over the flat country on either side, coming up to within about a foot of the bridge and almost touching the bridge girders. Plaintiff's

witnesses said that the water came up to the bottom of the girders of the bridge, which would make it about two or three feet below the gravel on top of the grade. A water line had formed when the water was at its height, and trash had collected there. Right after the accident the water was four or five feet lower than that. The water from the east and west sides of the fill came together in the washed-out fill.

Ralph Grover Breckenridge, a witness for plaintiff, testified that within a day or two of the accident and at the time of the accident the bayou was full and the whole country west of the tracks was under water. He could not give the exact depth of the water in the bayou on the day of the accident, but said that it was down partially from what it was a day or two before. He said he had observed in times of high water that the water when running off swirled from the east side of the tracks to the railroad, and that it "comes in and whirls before it leaves and goes on," that it had a similar effect on the west side, and that this occurred right where the fill went out and the wreck occurred.

Guffey said that the crest was reached about 1 p. m. Others testified that the crest was reached at 11 a. m. Flash rainstorms in the vicinity have occurred many times—one to three times a year. There was nothing to differentiate the rise of the waters on this occasion from many prior ones, when the water of the creek had risen to equal or greater height. On prior occasions, the rise of the water had done no damage, and there had never been any trouble at this place. There was no riprapping on this embankment. However, the evidence was to the effect that no riprapping is applied except where there is running water, and, in the exercise of sound engineering judgment, no riprapping was necessary at this point.

Guffey said that his "instructions were to watch all waterways and culverts and bridges and inspect them after high water." After a storm or very high water, the section foreman is supposed to go out immediately and patrol his track. He said he knew that high water is dangerous to railroad fills. Before the accident, he said that he made only the usual daily inspection while riding along on

a motorcar; that he and the section crew went over that part of the track two or three times on May 8, the day before the accident, because there had been a heavy rain early that morning and the creeks were rising. They were patrolling to watch the high water. By patrolling, he said that he meant going over the track on regular section motorcars. They stayed there from sometime in the forenoon until one o'clock and returned at four before they quit work that day. On May 9, between 11 and 12 a. m., they patrolled the track again, came back at one o'clock, and then walked back to bridge No. 3260 to see how much drift and trash had accumulated under the bridge. Guffey then walked over to the place where the accident later happened. He said that at that time there was no indication to him of there having been a washing, erosion, undermining, or other action of the weather in connection with the dirt fill. This was the last time he went over that piece of track before the accident. He did not notify his superiors of the high water. After the water receded, he made only the usual inspection from the top of the roadbed. He did not go down to the foot of the fill or go part way down. During the five years that he had been section foreman, he did not know of any thorough inspection or test of any kind ever having been made to determine the soundness of the base or lower part of the fill. He said that when Wild Horse Creek overflowed "it gets up pretty wild." He disclaimed knowledge of any burrowing of animals in the side of the hill, but had made no particular investigation along that line.

About 5:30 in the afternoon of May 9, Roadmaster Edwin F. Rohloff, traveling south, went over this track in a light inspection motorcar. As he passed the place where the accident occurred that evening, he reduced the speed of his motorcar to about five miles an hour, but, as everything seemed all right, he proceeded on. He could see where the water had been up considerably higher, and as he approached within several hundred feet of bridge No. 3260 he raised up so that he might have full view of the surroundings on the right of way in general to see "that everything was in good shape for the movement of trains." He continued in this position

to a point where the water was "clear away from the fill" and almost up to bridge No. 3263. He looked at both sides of the embankment. He said:

"In that country we have animals all over. They are burrowing in highways, on banks of railroad fills and all over the country, and not particularly in that place."

The fill during the time he had been roadmaster had not been inspected or tested for any undermining or any faulty condition in the base of the fill. The only observation made was by someone riding on the track or on a motorcar or train. He knew of no test that could have been made. Sounding rods are used to sound fills and around abutments on bridges. Rohloff had succeeded Chester J. Overholser in 1949. Overholser had jurisdiction over the territory in question from 1944 to 1949. He said that no riprapping had been placed along the fill, because in his opinion it was not necessary and he felt that the water after rains was well taken care of. There was nothing during the time he was roadmaster to suggest weakness of the embankment, or any tendency toward undermining, washing, scouring, or erosion of the soil at this location. While roadmaster, he inspected the particular section twice a week by train or motorcar. At times he walked along the track and down to the base of the fill. He went down to the base of the fill "not for any particular reason." He did no testing down there.

Prior to the accident, there had been regular train movements over this stretch of track. From May 8 at 3:05 a. m. until the time of the accident, 12 passenger trains and 14 freight trains had crossed this fill. Most of them were heavier than the freight train which was derailed. The rails, rolling equipment, and operation of the train did not contribute as a cause of the accident. The fill had been there for over 40 years, and ordinarily it would solidify with age. It seems reasonable to suppose that there was a connection between the collapse of the fill and the recent flash rain. In what way the excess water operated to cause this at the time it did and not before cannot be definitely ascertained. But Robert

Henry Spicer, who on May 9, 1950, was superintendent of the Oklahoma division of defendant, testified at the investigation held after the derailment that it was his conclusion "that the fill had been weakened by water from recent rains entering holes made by burrowing animals during a continued dry spell," and that—

"The water level on the west side of the fill was higher than the east side of the fill. After the water on the east side of the fill had come down, the water on the west side of the fill caused the enlargement of the holes through the embankment, causing the fill to settle under traffic."

It is evident from the detailed recital of the facts that there is no serious dispute as to the happening of the accident and the surrounding circumstances. Defendant contends that the evidence so overwhelmingly preponderates in its favor as to leave no doubt as to the factual truth that the accident was caused by conditions beyond its control, and that the court therefore erred in denying its motion for a directed verdict. Defendant concedes that at its inception this is a *res ipsa loquitur* case, and that the happening of the accident, if it had been unexplained, would justify an inference of negligence, but that any inference of negligence was totally and completely rebutted by undisputed evidence showing due care on the part of defendant, and that the accident was caused by forces over which defendant had no control and of which it had no knowledge. Defendant asserts, in short, that the evidence was insufficient to warrant submission of the case to the jury, and that it is entitled to judgment notwithstanding the verdict.

■ The action is brought under the Federal Employers' Liability Act (45 USCA, § 51, *et seq.*). Consequently, the sufficiency of the evidence to justify submission of the case to the jury is a federal question, and is to be determined by the holdings of the federal decisions. Jesionowski v. Boston & Maine Railroad, 329 U. S. 452, 67 S. Ct. 401, 91 L. ed. 416; Brady v. Southern Ry. Co. 320 U. S. 476, 64 S. Ct. 232, 88 L. ed. 239; Bimberg v. N. P. Ry. Co. 217 Minn.

187, 14 N. W. (2d) 410, 419, certiorari denied, 323 U. S. 752, 65 S. Ct. 87, 89 L. ed. 602.

Therefore, we must determine under what circumstances it is proper to direct a verdict for defendant in a case where the doctrine of *res ipsa loquitur* is applicable.

■ In Sweeney v. Erving, 228 U. S. 233, 240, 33 S. Ct. 416, 418, 57 L. ed. 815, 819, the United States Supreme Court stated its concept of *res ipsa loquitur:*

"* * * *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. *Res ipsa loquitur*, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is, whether the preponderance is with the plaintiff."

The propriety of the refusal to direct a verdict for defendant was in issue before the circuit court of appeals in an appeal from the United States district court for the district of Minnesota in C. & N. W. Ry. Co. v. Green (8 Cir.) 164 F. (2d) 55. There, a brakeman brought an action under the Federal Employers' Liability Act for injuries suffered in the derailment of a train. The evidence showed that the derailment was caused by a broken rail. The evidence also showed that the ties were rotten, and that a "slow order" which directed the train to be run slow near the place where the accident occurred had been disregarded. Defendant showed that the break of the rail was caused by a transverse fissure in the rail, not externally visible or capable of detection by the patrol inspections of the tracks and roadbed. The defect could be detected by the Sperry detector which defendants used twice a year and had used on this rail four and one-half months before the accident.

It was also shown that the rail was not broken before the train passed over it because, if it had been, the electrical signal box would have shown red. The court held that there was no error in refusing to direct a verdict for defendant. Even if defendant showed the cause of the accident, it was still for the jury to say whether defendant had exercised reasonable care. The court stated (164 F. [2d] 59) :

"In connection with what we have said, there must be kept in mind the emphasis in the recent decisions of the Supreme Court that the scope of jury inference in cases under the Federal Employers' Liability Act must be liberally and not narrowly or stultifyingly viewed. [Cases cited.] And traditionally, *even more plenary than in cases requiring proof of specific negligence is the scope of inference which has been recognized as being open to a jury in situations of res ipsa loquitur.*" (Italics supplied.)

The court continued (164 F. [2d] 60) :

"Only where the defendant's evidence of explanation and exculpation is so legally absolute that no possible hypothesis of proximate negligence can reasonably survive it on the facts and circumstances of the accident is a court entitled to direct a verdict in a res ipsa loquitur case. [Cases cited.] And these in cases under the Federal Employers' Liability Act will be situations of 'the rarest exceptions'."

In Terminal R. Assn. v. Staengel (8 Cir.) 122 F. (2d) 271, 274, 136 A. L. R. 789, certiorari denied, 314 U. S. 680, 62 S. Ct. 181, 86 L. ed. 544, this rule of hesitancy to direct a verdict in the absence of an "impressive showing" by defendant is again stated. In that case, plaintiff was riding on the last car of a freight train on track 72. All of the train, including the front trucks of the car on which plaintiff was riding, followed track 72. The rear trucks of the last car turned onto the 11th street track at the switch, and the car struck a steel pier between track 72 and the 11th street track. The defendant showed that the switch was set for track 72, that all cars except the last followed track 72, that after the acci-

dent the switch was set for track 72, that the switch was locked while the train passed over it, and that the switch operated perfectly both before and after the accident without repairs. The court held that it was not error to refuse to direct a verdict. Taking all of defendant's evidence as true, it yet remained a fact that the switch must have turned while the train was passing over. The court said (122 F. [2d] 275):

"To justify directing a verdict, the Court must be compelled to the conclusion that reasonable minds could not differ as to the lack of negligence of defendant. This it must do here in the face of an actual occurrence conclusively showing defective operation of the switch which is entirely devoid of explanation. We have no doubt that such conclusion is not compelled. The evidence here does not bring this case within that slight weakening * * * of the rule that no verdict can be directed in a res ipsa loquitur case."

The court continued (122 F. [2d] 276):

"With the rarest exceptions * * * we think the rule is as announced in Gleeson v. Virginia Midland Railroad Co., 140 U. S. 435, 444, 11 S. Ct. 859, 862, 35 L. Ed. 458, as follows: 'The law is that the plaintiff must show negligence in the defendant. This is done prima facie by showing, if the plaintiff be a passenger, that the accident occurred. *If that accident was in fact the result of causes beyond the defendant's responsibility, or of the act of God, it is still none the less true that the plaintiff has made out his prima facie case.* When he proves the occurrence of the accident the defendant must answer that case from all the circumstances of exculpation, whether disclosed by the one party or the other. They are its matter of defense. And it is for the jury to say, in the light of all the testimony, and under the instructions of the court, whether the relation of cause and effect did exist, as claimed by the defense, between the accident and the alleged exonerating circumstances.'" (Italics supplied.)

The basis for the hesitancy of the courts to direct a verdict in *res ipsa loquitur* cases is stated in Tennant v. Peoria & Pekin Union

Ry. Co. 321 U. S. 29, 35, 64 S. Ct. 409, 412, 88 L. ed. 520, 525, as follows:

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable."

This statement was applied and quoted in Sweeting v. Pennsylvania R. Co. (3 Cir.) 142 F. (2d) 611, a *res ipsa* case under the Federal Employers' Liability Act in which a directed verdict for the defendant was reversed. See Professor Prosser's article on this subject, *The Procedural Effect of Res Ipsa Loquitur*, 20 Minn. L. Rev. 241, 267.

Since the issue here must be determined by decisions of the federal courts, we shall not discuss the Minnesota cases to determine whether they are in accord.

■ The facts presented upon this appeal are such that the issue of negligence was properly submitted to the jury. It is true that defendant showed that the cause was a displacement of the fill. *It did not show the cause of the displacement of the fill,* nor did it show that a more complete inspection would have failed to disclose that the embankment was not adequate to support trains. There is no evidence that inspection at the base of the fill would not have disclosed its weakness. The frequent inspections made after the heavy rainfall from on top of the fill indicate that the employes of defendant were apprehensive of damage. But no inspection at the foot of the fill was made at any time. A finding that reasonable inspection would have failed to disclose the weakness rests just as much upon inference from the circumstances shown as

does a finding that further inspection would have disclosed the weakness. Either inference is reasonable, and either is permissible. But it is not for the court to say that one inference was more reasonable, and that the jury could not draw the other.

So, also, it was for the jury to decide whether, as suggested, the cause of the weakness of the fill was the burrowing of animals, and that reasonable care would not have disclosed the fact and thereby permitted the defendant to take care against them. It is conceded that at the outset of the case the fact of derailment by reason of collapse of the fill was sufficient to warrant a finding of negligence. Defendant showed that the accident *might* have been caused by burrowing animals: As defendant conceded, that is a *theory*. The jury could have adopted it. The jury could also have rejected it and found that, no cause having been shown for collapse of the fill, the inference that fills do not collapse without negligence and that trains do not run over weakened fills unless there has been negligence in maintaining an inspection and warning system had not been rebutted in the case, and the jury could accept it as the basis of its verdict.

■ Defendant also contends that the $45,000 verdict is excessive and that such a large amount is not supported by the evidence. For that reason, it asks for a new trial on that ground also.

At the time of the accident, plaintiff was riding in the cupola of the caboose—left side. Looking ahead, he observed what looked to him like a blast of fire. The caboose began to go from one side of the tracks to the other. It then jumped forward, almost stopped, and then started to jump backward and forward. About the first jump, Arthur J. McCullough, a brakeman who sat on the other side in the cupola, and plaintiff were knocked to the floor of the caboose. Plaintiff tried to get back into the cupola again, but was again knocked down. He said, "It was an awful bump"; that he was knocked down on his back in a sitting-down position. He was dazed but not unconscious. His arm and "everything" began to hurt. His back was paining him "more than anything else." He got off the caboose. The rear part of the train came to a stop 10 or

15 car lengths from the place where plaintiff got off. He proceeded to the front end of the train, walking through mud and water in a wheat field, by-passing the bayou. Because of the mud and water and the pain in his back, he had difficulty in walking. After he arrived at the engine, he and the engineer started arm in arm across the field to get help. The engineer testified:

"* * * When we left the engine Mr. Propper was kinda' holding his back, his hand on his hip and his back, and he said: 'My back hurts.' "

The assistant trainmaster arrived later and insisted that plaintiff go to a hospital. He was assisted to an automobile by two men— his arms around their necks and their arms supporting him at his back. On the way, they stopped several times for plaintiff to rest. He was in pain and groaning. He was taken to a hospital at Enid, where he was examined, given a hypodermic, and put to bed. In the afternoon of the next day, he was taken home to El Reno in an automobile driven by his wife. A day or two afterwards, he was taken to Oklahoma City for X rays and an examination by a Dr. West, a Rock Island railroad physician. After this, he was examined and treated by a Dr. Harbinson, chief surgeon for defendant at Oklahoma City, who prescribed some pills to relax plaintiff, an elastic brace for his left knee, and a brace for his back. Plaintiff described his condition immediately after the accident as follows:

"My back hurt awful severe and through my hip, my arm and leg. * * * I had a skinned place on my arm and black and blue spots on my back and hips. * * * my elbow was skinned right at the point of my elbow. * * * Both my knees were skinned, * * * black and blue spots * * * came later, * * * the next morning in the hospital."

The pain in his back extends to both hips, the right being more severe than the left. He has pain in the groin when he walks or when he tries to climb stairs or go down them. That pain first troubled him the night of the accident. He has to take short steps, because he suffers pain when he tries to take a normal-sized step.

He has to walk slowly, because of pain in his hips, groin, and back, and has been unable to walk in a normal way since the accident. He has difficulty sitting down in a chair and getting up. He suffered fright and shock from the accident, which has made him nervous and irritable. He is unable to sleep normally, and suffers from nightmares because of going through the wreck and fire that night. He wakes up screaming. At the time of the trial his nervous condition had improved somewhat. He said:

"I have overcome lots of it but it comes back on me; it goes and comes back."

He tires easily and has no strength to lift anything. The pills he is taking do not seem to help, except to put him to sleep for a while. Since the wreck, he claims that he has had four severe heart attacks. The first one occurred within a week of the accident. He had had no heart attacks before the wreck. Plaintiff sustained an accident in June 1940 while in the employ of a milling company. He was then unable to work for six months. Since the last accident, he has been unable to do any work around the house except feed the chickens and gather the eggs. For a period of five months after the accident he spent as much time in bed as he did up. His wife testified:

"* * * he has gradually improved to where he usually rests in the afternoon."

On September 22, 1950, he was examined by Dr. Francis W. Hollingsworth, examining physician for the Railroad Retirement Board, who testified:

"At that time we found, of course, based on his complaints of back pain—we found muscle spasm in the lower lumbar muscles of the back. A shock tenderness in the lower lumbar region of the back. And some limitation of motion of the hips, particularly on the right side * * *."

He examined him again in December 1950 and shortly before January 23, 1951. He said:

"I didn't see there had been any change at all since I examined him the first time."

Dr. William Bruce Catto, a physician called by plaintiff, was so discredited that no consideration can be given his testimony.

Dr. J. P. Korchik first saw plaintiff January 27, 1951, at which time plaintiff went to him for diagnosis and treatment. He found the lower back muscles to be spastic and tender to deep palpation—more on the right side than on the left. He found an ununited fracture of the tip of the right ulna. The left knee showed a slight irregularity of the articular surface but no evidence of a fracture. There was slight scoliosis of the lumbar spine, a curvature, with the convexing to the left, resulting from a pulling of the muscle. He found no fracture in the lumbar sacro spine. Dr. Korchik was of the opinion that on May 9, 1950, plaintiff sustained the following injuries: (1) Superficial abrasions and trauma to the various muscles and soft tissues in the body; (2) tearing or stretching of various ligaments to the lumbar sacrum, right hip, and left knee joint; (3) chip fracture of the tip of the right ulna which remains separated from the original source; (4) post-traumatic neurosis, which he described as an "injury to the nervous system, which we cannot show with X-ray or in any objective manner. It is injury sustained to a person's nervous system, and in that way, his behavior and emotional setup"; and (5) aggravation of a coronary heart ailment. He said that plaintiff needed a heavy back brace in order to obtain some relief from the severe backache. He prescribed treatment for plaintiff's ailments. In Dr. Korchik's opinion, plaintiff has from 75 to 80 percent partial permanent disability in his lower back; 20 percent disability in his right elbow; 10 percent disability of his left knee; and a total and permanent disability as far as any railroad work is concerned.

Dr. James E. O'Donnell first examined plaintiff for diagnosis and treatment on August 14, 1950, again on October 31, 1950, and finally on January 29, 1951. On the first examination, he found a loose bone chip over the back of the elbow—about ⅞ of an inch long and ¼ of an inch wide. Plaintiff was sensitive to pressure at that point.

This could be removed without any difficulty under novocain. Motion in the elbow is not limited. He found no evidence of injury to the upper back. There was some increased curvature of the spine at the level of the twelfth dorsal and first lumbar vertebrae, a compensation curve at that point. The lower back muscles, the lumbar muscles at the left of the spine, were held more spastic and tight than those to the right. He was very sensitive to pressure over the lumbar sacral joint and over the central part of the right sacroiliac joint. He flinched when pressure was applied to both spots. His side-to-side twist was 50 percent normal. He could bend forward at the waistline to almost normal range. Normal is 90 degrees, and he could get it to 70 percent. When the Koernig (straight-leg raising) test was applied, he complained of pain in the lower back. He had some difficulty in getting up from the examination table after lying on his back. He held his back stiff when getting up from a chair. The X rays of the back disclosed nothing except a defect which the doctor disclosed as a congenital condition. On the second examination on October 31, 1950, Dr. O'Donnell found plaintiff in about the same condition as on August 14, except that he complained of pain not only in the back but also some pain in the groin. At the last examination on January 29, 1951, plaintiff said that he no longer had any pain about the neck, but he complained of some pain about the elbow and through the lower back, extending over the buttocks region and into both loins, but not down the leg. He stated that he had pain when bending or stooping, and that he avoided reaching because of the lower-back pain. He indicated that in getting up from a chair or bed or in turning about in bed he had this pain in the lower back. At this time plaintiff weighed 221 pounds. This was stripped weight, wearing a steel and leather back brace. (At the time of the accident plaintiff weighed 226 pounds.) On January 29, the lower back did not show as much muscle spasm as on the two previous occasions, which the doctor attributed to the fact that plaintiff "had been wearing this steel back brace, and that had helped its contraction to some extent." Plaintiff was still just as sensitive over the lumbar sacral point on pressure. In bending for-

ward from the waistline, plaintiff could bend to 25 degrees of normal, but in assuming a standing position, he did so by "pushing over to the side and helping himself up, again favoring that lower back." Dr. O'Donnell was of the opinion that plaintiff had sustained a back sprain—a strain on the lumbar sacral ligaments over the lower back. He also had pain over his right sacroiliac region. The doctor said:

"* * * He had a potential weakness in the back; he had the congenital condition of spina bifida occulta, which is a defect of Nature, in that that bone, the two hooks, do not come together at that lower part of his back. Therefore, that leaves a potential weakness there and it leaves a part of the back more susceptible to injury."

He was of the opinion that the injury aggravated a pre-existing condition of weakness "in the lower back by that spina bifida occulta." The curvature of the spine plus the spina bifida occulta could give a man of plaintiff's weight a pain in the back. The doctor said that the main injury was to the back, and that he had from the patient "those other complaints of nervousness—told me he was melancholy—but my chief concern was examining his back and his elbow." His opinion was that plaintiff would be confined largely to some light form of work; that he had such a back condition that if he subjected his back to a heavy strain such as lifting or jumping he would have pain and would suffer from it; that there were quite a few things that he could do with the back by favoring it and wearing the back brace, and that at times he might be able to get along without the brace, but if it got too painful he should put it on again. He said:

"* * * I do believe he is unfit for heavy work where it is necessary to stoop or lift much; in other words, any type of work that will throw quite a little strain on that lower back."

Dr. Donald R. Reader, a specialist in psychiatry and neurology, examined plaintiff on November 6 and 7, 1950, and again on January 29, 1951. He said:

"The principal objective symptom of injury was the muscle spasm in the lower back. That muscle spasm restricted mobility of the back in almost all directions. He had difficulty in bending freely, either forward or backward or from side to side or rotating the back. * * * His subjective complaints consisted of the bulk of his other symptoms."

It was his opinion that plaintiff had two separate conditions, that he was subjected to a post-traumatic neurosis, as well as chronic lumbar-sacral strain, and that the lumbar-sacral strain appeared to be superimposed upon a congenital vertebrae deformity. In his opinion, plaintiff's complaints disclosed a typical functional neurosis, such as that resulting from emotional shock and injury. Such a neurosis causes suffering and disability in varying degree. He estimated plaintiff's disability to be about 50 percent from nervous symptoms alone. He doubted whether the traumatic neurosis would last for the rest of plaintiff's life, but thought that it might persist for years. He said:

"I can only estimate several years probably, but I don't think it will be a permanent condition for the rest of his life."

In June 1940, plaintiff had an accident resulting in an almost identical injury to his back, with complaints as to pains in the back similar to those he makes here. For months he did no work whatever. His case was heard before the Oklahoma industrial commission and disposed of in November 1940. A short time thereafter he was employed, first selling automobiles, then in the city street department, and then as a section hand for the railroad. Plaintiff testified that he recovered entirely from that accident.

Plaintiff was earning about $4,900 per year at the time of the accident. The only expense, as shown by the evidence, was $75, the cost of the medical attendance of Dr. O'Donnell, and $40, the cost of a belt. Dr. Catto, to whom reference has already been made, said that his bill is "around a hundred and a quarter."

An appellate court is reluctant to disturb a verdict as excessive in a case where the amount has the approval of the trial court. But

it does not follow from our reluctance that we should permit all verdicts to stand. Such a procedure would in numerous cases result in plain injustice. There can be no question that the verdict of a jury is subject to the supervision of the court, whether it is too large or too small. In this case, the verdict is $45,000, a very substantial amount even at this day. Dr. Donald R. Reader, a specialist in psychiatry and neurology, called by plaintiff, testified that plaintiff was suffering from traumatic neurosis, as well as chronic lumbar-sacral strain, and that the lumbar-sacral strain was superimposed upon a congenital vertebrae deformity. Plaintiff testified that he had four heart attacks after the accident, but there was no direct medical testimony as to them. Dr. Reader doubted whether the neurosis condition was permanent. Traumatic neurosis is a real ailment, but both the medical and the legal profession seem to agree that considerable improvement, if not complete recovery, follows the termination of litigation. That leaves for consideration the lumbar-sacral strain. In this case, outside of a small chipping at the elbow, there were no bones broken. The injuries were centered chiefly in the soft tissues of the lower back. The symptoms were chiefly subjective. Where proof of damages is by subjective symptoms only, a sizeable verdict is subjected to close scrutiny. Johnson v. G. N. Ry. Co. 107 Minn. 285, 119 N. W. 1061; Haugen v. N. P. Ry. Co. 132 Minn. 54, 155 N. W. 1058; Levan v. C. R. I. & P. Ry. Co. 158 Minn. 69, 196 N. W. 673; Becker v. Megan, 204 Minn. 283, 283 N. W. 401.

It has been the practice of this court to order a new trial upon the question of damages only (see, Lundblad v. Erickson, 180 Minn. 185, 230 N. W. 473; Appleby v. Payne, 149 Minn. 77, 182 N. W. 901), at least where the issue of defendant's liability has been fairly and fully tried in the district court. Howard v. Village of Chisholm, 191 Minn. 245, 253 N. W. 766. Where the evidence of defendant on the issue of liability is such that it appears unlikely that a different result would be reached upon a new trial, the issue of liability should not be relitigated, unless there is a substantial reason for doing so, even though a new trial is necessary on the issue of dam-

ages. Smith v. G. N. Ry. Co. 133 Minn. 192, 158 N. W. 46; Lundblad v. Erickson, 180 Minn. 185, 230 N. W. 473. But if it appears that excessive damages awarded are the result of passion or prejudice, and the consequences of the passion or prejudice extend to the other issues in the case, a new trial must be granted on all the issues. Morner v. Kohen, 172 Minn. 543, 216 N. W. 233.

In Norfolk Southern R. Co. v. Ferebee, 238 U. S. 269, 35 S. Ct. 781, 59 L. ed. 1303, an action under the Federal Employers' Liability Act, it was held that if the liability of defendant and the issue of contributory negligence appear to have been decided by the jury upon sufficient evidence and without error, a new trial may be granted upon the issue of damages only.

In the instant case, the record indicates that the verdict was not the result of appeal to passion and prejudice. Nor does defendant make any such claim. Its sole claim is that the evidence does not sustain a verdict of that size.

"* * * a study of results reached in the reported cases seems to justify the statement that the courts generally grant relief if convinced that the verdict substantially exceeds or falls below any rational appraisal or estimate of the damages, even though the inference of passion, prejudice, partiality, or other improper notice [sic] on the part of the jury is no more natural or reasonable than the inference of mistake or misapprehension on their part." 15 Am. Jur., Damages, § 204.

The accident took place on May 9, 1950. The trial was commenced on February 2, 1951, less than nine months thereafter. The injuries complained of affected soft tissues only, in addition to traumatic neurosis. Since plaintiff was earning about $410 per month, he had lost about $3,700 in wages. He spent only one night and part of a day in a hospital. His medical expenses amount to $115, not including Dr. Catto's charge. We are of the opinion that the verdict is excessive, and that in furtherance of justice a new trial as to damages only should be granted.

Reversed and new trial granted as to damages only.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS.

On September 5, 1952, the following opinion was filed:

PER CURIAM.

In the case at bar, a personal injury action, defendant-appellant prevailed on the question of excessive damages awarded by the jury, and a new trial was ordered on that question alone. The clerk of this court taxed appellant's costs and disbursements against respondent, who now appeals, asserting that this action on the part of the clerk was erroneous.

Respondent cites eight Michigan cases, where the rule for the taxation of costs and disbursements is apparently different from that in this state. He also cites a number of Minnesota cases in an endeavor to distinguish the case at bar from the Minnesota cases cited by appellant on the ground that in the Minnesota cases which appellant cites no new trial was granted.

The rule is well established in this court that if a party prevails in obtaining a modification of the order of the court below he is the "prevailing" party. See, C. & N. W. Ry. Co. v. Verschingel, 197 Minn. 580, 589, 268 N. W. 2, 709, 710; Henderson v. Northwest Airlines, Inc. 231 Minn. 503, 511, 43 N. W. (2d) 786, 792; Krusemark v. Krusemark, 232 Minn. 416, 421, 46 N. W. (2d) 647, 651.

In Hildebrandt v. Hagen, 228 Minn. 353, 360, 38 N. W. (2d) 815, 820, this court said:

"It is well settled here that the modification of a judgment entitles the party obtaining the same on appeal to costs and disbursements. This is true even though the disbursements were made in providing a record and brief on the issues upon which the party obtaining the modification did not prevail. Sanborn v. Webster, 2 Minn. 277 (323); Allen v. Jones, 8 Minn. 172 (202); Henry v. Meighen, 46 Minn. 548, 49 N. W. 323, 646; Curry v. Sandusky Fish Co. 88 Minn. 485, 93 N. W. 896; C. & N. W. Ry. Co. v. Verschingel, 197 Minn. 580, 268 N. W. 2, 709; State ex rel. Bd. of Christian Service v. School Board, 206 Minn. 63, 287 N. W. 625. In the Verschingel case, this court affirmed the trial court's orders (197 Minn.

588, 268 N. W. 7) 'except as to the counsel fees allowed.' This modification, this court later concluded, made appellants the prevailing parties and permitted taxation of costs in their favor. It follows that there is little doubt that the modification directed here was sufficient to justify costs in appellant's favor had his appeal included this issue."

The clerk's taxation is affirmed.